STATE of Missouri, Respondent,

v.

Charles Bruce MILLER, Appellant.

No. WD 30995.

Missouri Court of Appeals,
Western District.

Aug. 4, 1980.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 2, 1980.

Application to Transfer Denied
Oct. 15, 1980.

Bunch, O'Sullivan, Sandifer & Hill, William F. O'Sullivan, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Darrell Panethiere, Asst. Atty. Gen., Kansas City, for respondent.

Before CLARK, P. J., and DIXON and SOMERVILLE, JJ.

SOMERVILLE, Judge.

Defendant was charged with rape (Sec. 559.260, RSMo Supp.1975), found guilty by a jury, and sentenced to twenty years confinement in the Missouri Department of Corrections. The offense occurred on July 26, 1978, in Cass County and was tried on March 15, 1979, in Bates County on change of venue.

Defendant's appeal is rife with afterthought—he seeks appellate review of the first two of the following three points under the "plain error" rule: (1) the state's verdict directing instruction failed to require a finding by the jury that defendant had knowledge that the prosecutrix submitted to ravishment because of threats of violence made by one George Mercer, and there was no evidence to support the first leg of the disjunctive submission that defendant "acted either alone or knowingly and with common purpose together with George Mercer"; (2) the trial court abused its discretion in refusing "to allow the case to go into a second day" because doing so prevented defendant from introducing into evidence certain hospital records which would have disclosed that the prosecutrix had not sustained any visible signs or marks of physical trauma; and (3) the trial court abused its discretion in overruling defendant's objection and request for a mistrial directed towards the prosecuting attorney's characterization of defendant as a "vulture" during the state's final argument.

Although defendant has not challenged the sufficiency of the evidence to sustain his conviction, a detailed resume thereof cannot be avoided because of its direct bearing upon the points raised on appeal. All seamy, offensive, gutter language, replete throughout the record, has been deleted insofar as possible.

On the afternoon of July 25, 1978, the prosecutrix was visiting her boyfriend at the latter's home located in a suburban community in the Kansas City, Missouri,

metropolitan area. At the time prosecutrix was seventeen years of age and weighed approximately one hundred pounds. The prosecutrix's boyfriend was twenty–two years of age and weighed approximately one hundred and twenty–five pounds. Her boyfriend shared the home with another fellow. Several hours after her arrival her boyfriend left to help a friend with a roofing job, leaving the prosecutrix alone with the fellow who shared the home.

Shortly thereafter defendant and four companions, one of whom was George Mercer, brazenly entered the home unannounced and uninvited. Defendant was twenty–seven years of age and weighed approximately two hundred and ten pounds. George Mercer was in his thirties and weighed approximately one hundred and seventy pounds. Defendant's other three companions ranged from twenty–nine to thirty–eight years in age. The fellow who shared the home with prosecutrix's boyfriend took leave and the prosecutrix was left alone with the five intruders. An attempt by the prosecutrix to leave was thwarted when George Mercer told her that she was not going anywhere and ordered her to sit down. George Mercer then asked the prosecutrix if she wanted to "go partying" and she replied that she did not. George Mercer then grabbed the prosecutrix by the hair and slapped her with his open hand. He then pulled the prosecutrix to her feet, twisted her arm behind her back, and led her out to a car which the five had arrived in. The prosecutrix was ordered to get into the back seat of the car. Before the car left, her boyfriend returned with the fellow he assisted on the roofing job. It was approximately 9:00 P.M. at the time. The prosecutrix managed to get out of the car and, emotionally upset and in a state of tears, ran over to her boyfriend and told him "these guys are going to take me". The prosecutrix, her boyfriend, and the fellow he assisted on the roofing job then entered the house.

Shortly thereafter defendant and his four companions returned to the house, at which time George Mercer boasted about his "toughness" and bragged that everyone in Kansas City, including the police, were afraid of him. The fellow whom prosecutrix's boyfriend assisted on the roofing job was then viciously attacked by George Mercer and hit several times on and about the face and head. Another of defendant's companions then jumped on the fellow, continued the assault, and threatened to stab him with a switchblade knife. He was left bleeding badly and considerable blood was spewed about the house. The victim of this assault was nineteen years old and weighed approximately one hundred and thirty pounds. George Mercer told the prosecutrix and her boyfriend that "this is mild compared to what is going to happen if I catch any heat from anybody or the police". He also told prosecutrix she was going to get hurt if she didn't come with them. George Mercer then asked prosecutrix's boyfriend whether he "would mind" if they took his "old lady out partying". Hearing no objection, George Mercer twisted prosecutrix's arm behind her back and, accompanied by his four companions, took her to their car.

The car, with the prosecutrix and the five intruders in it, then drove to the parking lot of a bar located in the southeast metropolitan area of Kansas City, Missouri. While there one of the five intruders, a person other than defendant or George Mercer, got into a fight and stabbed an unidentified individual.

The car then left the bar and proceeded to the drive–up window of a liquor store where a case of beer and a bottle of wine were purchased. The car then proceeded in a southerly direction and pulled into a bean-field in an isolated area of Cass County sometime after midnight. Defendant, his four companions, and the prosecutrix got out of the car and George Mercer ordered the prosecutrix to take off all of her clothes. She complied because she "was real afraid not to do what they said". While she was disrobing unidentified members of the group "grabbed" at her and remarked about what "a nice body they had". George Mercer then told the prosecutrix to let "his bros [referring to his companions] do whatever they want."

The oldest member of the group then took the prosecutrix to the rear of the car and had intercourse with her on the trunk lid. The prosecutrix was crying and begging them to not do anything and "not to hurt her". Defendant then took the prosecutrix to the front of the car and had sexual intercourse with her on the hood of the car.

George Mercer then suggested that defendant and the other three members of the group leave and that defendant return in his "panel van". Defendant and the other three members of the group complied. Before defendant returned in his "panel van", George Mercer attempted to have anal intercourse with the prosecutrix.

Defendant returned to the beanfield alone in his "panel van", picked up George Mercer and the prosecutrix, and then drove to defendant's house. While en route to defendant's house, George Mercer had sexual intercourse with the prosecutrix in the "panel van". When they arrived at defendant's house the three went inside and defendant again had sexual intercourse with the prosecutrix. The prosecutrix was crying all the time. George Mercer again attempted to have anal intercourse with the prosecutrix. George Mercer then suggested that they "keep" the prosecutrix but defendant said he "thought she had enough". The prosecutrix was then given her clothes and driven by defendant to her boyfriend's house and released. After the prosecutrix was released she went to St. Luke's Hospital where she was examined at approximately 4:30 A.M. According to the state's evidence, defendant was present at all times throughout the aforementioned course of events, except for those events which occurred when he left to get his "panel van".

Defendant took the stand and testified in his own behalf. According to defendant, he and his companions, joined by the prosecutrix, drank some beer and smoked some marijuana while they were at the prosecutrix's boyfriend's house. He denied that he had sexual intercourse with the prosecutrix at any time. He further testified that he never heard George Mercer threaten the prosecutrix and that she willingly accompanied the group when they left. Moreover, while the prosecutrix was undressing in the beanfield he and one of his companions left the area on foot and were gone for a short period of time. When they returned, according to defendant, the prosecutrix was having sexual intercourse with other members of the group on the hood of the car and, after finishing, she gave defendant the "come on" but he rebuffed her. After defendant, George Mercer and the prosecutrix arrived at defendant's house the only thing the prosecutrix said was "take me home". According to defendant "she was so wasted she couldn't say nothing, just about."

■ Defendant's first point on appeal encompasses a multi–faceted attack on the state's verdict directing instruction absent any objection thereto by defendant, either during trial or in his motion for new trial. Perforce, the point has not been preserved for appellate review. Rule 28.03; and *State v. Murry*, 580 S.W.2d 555 (Mo.App. 1979). Aware of this hiatus, defendant attempts to salvage the point for appellate review by imploring this court to consider it as "plain error" under Rule 30.20. Defendant faces a formidable task in this regard as there is no such thing as "plain error" per se. Undaunted by this burden, defendant conveniently assumes that "prejudicial error" and "plain error" are synonymous terms and that every instance of "prejudicial error", whether preserved or not, constitutes a basis for appellate relief. The falsity of defendant's assumption is easily demonstrated by resorting to prejudicial and harmless error as a frame of reference. "Prejudicial error", if properly preserved, affords a basis for appellate relief. On the other hand, "harmless error", even though properly preserved, affords no basis for appellate relief. If "prejudicial error" is ipso facto "plain error", then no claim of error constituting a basis for appellate relief would need to be preserved for appellate review. Procedural anarchy would inevitably follow if such was the case, and the adverse consequences flowing therefrom

would be virtually limitless. For example, the valuable input of trial courts in the post trial review process would often be eliminated and many instances of error otherwise correctible at the trial court level would frequently be unnecessarily delayed by the appeal process.

The benchmark of "plain error" is error which works "[a] manifest injustice or miscarriage of justice". Rule 30.20. It is manifest that "prejudicial error" and "plain error" are not equivalent terms and that resort to "plain error" as a basis for appellate relief entails far more than a determination that the error complained of was "prejudicial error" in the classic sense. Although "prejudicial error" is a condition precedent of "plain error", "prejudicial error" does not inevitably rise to the level of "plain error". Unfortunately, no talismanic method exists for determining "plain error". It can be said, however, that "plain error" is "prejudicial error" which so substantially affects the rights of an accused that "manifest injustice" or a "miscarriage of justice" inexorably results if left uncorrected. Thus, "plain error" is a unique and elusive concept because of its lack of fixed dimension. Consequently, it has been judicially recognized that the existence or non-existence of "plain error" must be coped with on a case to case basis and rebalanced each time against the particular facts and circumstances of each case. *State v. Patterson*, 443 S.W.2d 104, 107 (Mo. banc 1969). For this reason, identical claims of "prejudicial error" may rise to the level of "plain error" in one case but not in another because of variant facts and circumstances.

The state's verdict directing instruction was a combination of MAI–CR 6.40, captioned "Rape: Forcible", and MAI–CR 2.10, captioned "Principals: Active Participants or Conspirators", and, insofar as here pertinent, required the jury to find and believe from the evidence beyond a reasonable doubt that defendant inserted his sexual organ into the sexual organ of the prosecutrix, that defendant "did so against her will and after George Mercer caused her to submit by threats which caused her to fear physical violence to herself", and in doing so defendant "acted either alone or knowingly and with common purpose together with George Mercer." Defendant principally faults the instruction for not requiring a finding by the jury that defendant knew at the time that the prosecutrix's will to resist had been overcome by threats of physical violence made by George Mercer.

Regarding the first prong of the multi-faceted attack on the state's verdict directing instruction, defendant relies on *State v. Gray*, 497 S.W.2d 545 (Mo.App.1973). In *Gray*, the state's verdict directing instruction hypothesized that the accused raped the complaining witness "against her will and forcibly after she resisted to the utmost of her ability." It was clear from the evidence, and undisputed by the state, that actual force in the form of physical violence was not used in perpetrating the rape. As a matter of fact, the only evidentiary basis to support a finding that the complaining witness's will had been overcome and that the act of intercourse was nonconsensual were threats made by a third party causing her to fear physical violence to herself. Moreover, as pointed out by the court in *Gray*, the state's verdict directing instruction was not predicated on a finding by the jury that the accused and the third party who made the threats were acting in concert, and the posture of the evidence was such that the threats of violence, solely attributable to the third party, appeared to have been made outside the presence of the accused. *Gray* held, 497 S.W.2d at 549, "that one may be guilty of rape if his victim submits through fear of physical violence, even if that fear is caused by one other than the defendant,[1] if the defendant at the time has knowledge that his victim is submitting through such fear." The *Gray* court held the state's verdict directing in-

1. *State v. Berry*, 593 S.W.2d 254, 255 (Mo.App. 1980), and *State v. Davis*, 557 S.W.2d 41, 43 (Mo.App.1977), are examples of cases applying the same legal rationale. Also, it is parenthetically noted that sexual intercourse unresisted because of fear of physical violence is nonconsensual in the eyes of the law. *State v. Berry*, *supra*, and *State v. Davis*, *supra*.

struction erroneous under the "plain error" rule because the evidence was insufficient to support a finding of guilt predicated on the use of actual force by the accused as opposed to the complaining witness's subduction due to fear of physical violence occasioned by threats of a person other than the accused. The judgment was reversed and the case was remanded for a new trial. In doing so the court noted as follows, 497 S.W.2d at 549: "We believe this is a case for submission to a jury with instructions that to find guilt it must find that defendant's act was done against the prosecutrix's will after she was caused to submit by threats of Fats [a person other than defendant] which caused her to fear physical violence to herself and that defendant at that time had knowledge that she was submitting because of threats of Fats [a person other than defendant]."

 Regarding the first half of his bifurcated challenge to the state's verdict directing instruction, defendant does not challenge the sufficiency of the evidence to support the state's theory of the case, nor does he question the sufficiency of the evidence to sustain the guilty verdict returned by the jury. He does, however, complain that the state's verdict directing instruction was "clearly prejudicial" because it failed to require the jury to find that he had knowledge at the time he allegedly raped the prosecutrix that she submitted because of fear of physical violence occasioned by threats made by George Mercer. Assuming, arguendo, that the omission constituted "prejudicial error", as previously pointed out, that alone is not sufficient to compel review under the "plain error" rule. More particularly, according to State v. Murphy, 592 S.W.2d 727, 733 (Mo. banc 1979), "plain error does not result in connection with instructions unless the court has so misdirected or failed to instruct the jury on the law of the case as to cause manifest injustice." By reason of the particular facts and circumstances presented by the record in the instant case, it cannot be said that the "prejudicial error" relied on rose to the requisite height of "plain error". Defendant concentrated on the classic fact defense

of "I didn't do it" rather than "I did it believing that the prosecutrix was a willing and submissive partner and was unaware that her will to resist had been overcome by fear of physical violence due to threats made by George Mercer." The state's evidence consistently hewed to the line that the prosecutrix unwillingly submitted to the series of rapes, including the one perpetrated by defendant, out of fear of physical violence threatened by George Mercer. It is also significant that all of the evidence, that of the state as well as that of the defendant, provided a basis for the jury to have reasonably found that defendant was present and within hearing distance when George Mercer so intimidated the prosecutrix with threats of physical violence that she unwillingly left her boyfriend's home. Moreover, according to the state's evidence, when the group arrived at the beanfield, defendant was present and a part of the depraved group that witnessed the prosecutrix as she was forced to disrobe and submit to mass, sexual ravishment out of fear of physical violence engendered by threats made by George Mercer. There is a wide chasm between the attendant facts in State v. Gray, supra, and those in the instant case. In Gray, there was a total lack of evidence that the accused was present so as to have had knowledge of the threats of violence directed towards the complaining witness by the third party, while just the opposite is true in the instant case. Here, according to the state's evidence, there was no break in the chain of events from beginning to end and the thrust of the state's evidence was that defendant was present, within hearing distance, and aware at all times of the threats of physical violence directed towards the prosecutrix by George Mercer which overpowered her will to resist. This court is not convinced that the state's verdict directing instruction misled the jury into returning a guilty verdict absent believing that defendant was fully aware that the prosecutrix submitted to sexual intercourse with him due to threats of physical violence directed towards her by George Mercer. The prosecutrix was con-

fronted and repeatedly violated by a group of burly, mature, domineering males. She was literally at their mercy, and by reason of the guilty verdict it is inconceivable that the jury found or believed that the prosecutrix consented, in a legal sense, to defendant's invasion of her body, or that defendant was in a state of ignorance regarding the threats of violence heaped upon her by George Mercer. The state's evidence overwhelmingly demonstrated that the prosecutrix's will to resist defendant had been overpowered by George Mercer's threats of physical violence. This, coupled with the fact that the prosecutrix was treated as a sexual pawn by the group, decries any notion that she consented, in a legal sense, to the act of sexual intercourse perpetrated upon her by the defendant. Defendant's contention that the jury should have been further instructed to find that he had knowledge of the threats of physical violence heaped upon the prosecutrix by George Mercer, vis-a-vis the corollary requirement that failure to do so resulted in "manifest injustice" or a "miscarriage of justice" in order to come under the umbrella of "plain error", fades into relative insignificance where the evidence, as here, overwhelmingly demonstrated that the prosecutrix did not consent, in a legal sense, to sexual intercourse with the defendant, and defendant was not misled into believing otherwise. The "prejudicial error" alluded to in the first phase of defendant's multiple attack on the state's verdict directing instruction, balanced against the particular facts and circumstances revealed by the record, does not connote a jury verdict fraught with "manifest injustice" or a "miscarriage of justice".

The final prong of defendant's bifurcated attack on the state's verdict directing instruction complains of a lack of evidence to support the first leg of the disjunctive submission that he "acted either alone or knowingly and with common purpose together with George Mercer" in perpetrating the charged offense. Suffice it to say, there was a wealth of evidence from which the jury could find that defendant and George Mercer were knowingly acting in concert with a common purpose in mind, namely, sexual ravishment of the prosecutrix, and that same evidence also lent itself to the reasonable inference that defendant, acting individually and apart from George Mercer, seized upon the fear and emotional distress instilled in the prosecutrix by George Mercer to satisfy his own sexual lust. Under analogous facts, a similar objection to a state verdict directing instruction in a rape case, albeit properly preserved for appellate review, was rejected in *State v. Davis*, 557 S.W.2d 41 (Mo.App. 1977). Perforce, it cannot be said that the trial court committed "prejudicial error", much less "prejudicial error" of such pervasive intensity that it rose to the magnitude of "plain error".

Defendant's second point, which he also seeks appellate review of under the aegis of "plain error", focuses upon termination of the trial before defendant had an opportunity to introduce certain hospital records compiled by St. Luke's Hospital which he claims would have rebutted any inference drawn from the state's evidence that the prosecutrix suffered visible signs of physical trauma on the occasion in question. The following course of events is mentioned in order to put this point in proper perspective. During the afternoon of the one day trial, and, more particularly, following the appearance of a nurse's aide employed by St. Luke's Hospital called by the state to establish the chain of possession of a sperm sample taken from the prosecutrix's vagina during her examination at St. Luke's Hospital, defendant claims he had a subpoena duces tecum issued for the hospital records pertaining to the physical examination just mentioned. The trial went into a night session and the trial judge, ostensibly out of concern for the jurors, made it clear that he intended to complete the trial that evening. No evidence of any kind was offered to substantiate issuance of the purported subpoena duces tecum, or to whom it was directed, or that service of the purported subpoena duces tecum was ever sought or obtained. Defendant made no effort to have the court declare a recess and resume

the trial the following day, but contented himself with an oblique reference to the matter at the close of all the evidence to the effect that "subject to making a record here with reference to some other witnesses who were subpoenaed, the defendant rests." Since no aspect of this matter was ever mentioned or raised by defendant in his motion for new trial, any error purportedly attached thereto was not preserved for appellate review. Former Rule 27.20(a), in effect and applicable at the time; *State v. Rowden*, 452 S.W.2d 210 (Mo.1970); *State v. Coleman*, 460 S.W.2d 719, 725 (Mo. banc 1970); and *State v. Madison*, 537 S.W.2d 563, 565 (Mo.App.1976). See also present Rule 29.11(d). Notwithstanding defendant's imploration, this point does not fall under the patronage of "plain error" for a number of reasons. One, the state's verdict directing instruction was not cast in terms of physical violence having been inflicted upon the prosecutrix, but, instead, was cast solely in terms that she was raped by defendant "against her will and after George Mercer caused her to submit by threats which caused her to fear physical violence to herself." Two, although there was evidence that George Mercer grabbed the prosecutrix by the hair, slapped her with his open hand, and twisted her arm behind her back, there was no evidence whatsoever that doing so produced any visible marks of physical trauma. The sole ground relied upon by defendant in advancing this point is that the hospital records were purportedly relevant because they would have tended to contradict prosecutrix's testimony that George Mercer grabbed her by the hair, slapped her in the face with his open hand, and twisted her arm behind her back. The state's theory of submission, i. e. subduction of the prosecutrix's will to resist by threats of force as opposed to the infliction of actual force, conjoined with a total lack of evidence that the minimal instances of physical abuse produced any visible marks of trauma, precludes this unpreserved assignment of error, even if deemed "prejudicial", from being elevated to the status of "plain error" for purposes of appellate review. Although this court does not condone any

mistaken notion that judicial expediency or juror convenience should be given priority over an accused's right to fully and completely present any and all legally admissible evidence he may choose to present in his behalf, it cannot be said in the instant case that defendant's self–proffered inability to introduce the controversial evidence resulted in a guilty verdict marked with "manifest injustice" and "miscarriage of justice."

Defendant's third and final point is unique in the sense that it is the only one preserved for appellate review. The prosecuting attorney, during closing argument, referred to the defendant as a "vulture" in the following context: "The State is full of young girls, who are small, hundred pound girls, who are 17 years old, that find themselves in vulnerable positions, and this is the kind of vulture that takes advantage of them and does what he did." Defense counsel's objection to the prosecutor's characterization of defendant as a "vulture" was overruled by the trial court and a subsequent request for declaration of a mistrial premised upon the same ground was denied by the trial court. The rulings of the trial court in this connection were reasserted and raised by defendant in his motion for new trial to no avail.

The use of epithets by prosecutors during closing argument is ill advised and if there are no evidentiary bases to which they can be traced their use joins the ranks of prejudicial error. *State v. Heinrich*, 492 S.W.2d 109 (Mo.App.1973). Conversely, though their use is not condoned or sanctioned, doing so does not rise to the level of prejudicial error if the epithets employed are traceable to some evidentiary bases. It has been held that use of the following epithets failed to rise to the level of prejudicial error: "young punk"–*State v. Wallace*, 504 S.W.2d 67, 72 (Mo.1973) *cert. denied* 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 76 (1974); "lying thief"–*State v. Harris*, 351 S.W.2d 713, 716 (Mo.1961); "desperado" and "hoodlum"–*State v. Ayers*, 305 S.W.2d 484, 487 (Mo.1957); "pimp"–*State v. Armstead*, 283 S.W.2d 577, 583 (Mo.1955); and "drunken killer"–*State v. Eison*, 271 S.W.2d 571, 573 (Mo.1954). The court in *State v. Mayfield*, 562 S.W.2d 404, 412 (Mo.App.1978),

held that the prosecutor's characterization of the accused as "some kind of monster" and a "base animal" did not constitute reversible error. As noted in *Mayfield*, "Courts have held that such name-calling, while ill advised, is not prejudicial, especially where there is evidence to support such a characterization." When this legal template is superimposed on the facts at hand the prosecutor's reference to defendant as a "vulture" did not constitute reversible error. Webster's New World Dictionary (2d College Edition 1974) gives one definition of "vulture" as "any greedy and ruthless person who preys on others". The prosecutor obviously referred to defendant as a "vulture" in a metaphorical sense and there was a wealth of evidence to draw upon for doing so. The rapacious nature of defendant courses throughout the facts of this case. Although this court does not mean to imply that the prosecutor's reference to defendant as a "vulture" carries a stamp of judicial approval,. it cannot be said that his doing so constituted reversible error when the underlying facts are juxtaposed with the prevailing case law of this state.

Judgment affirmed.

All concur.