STATE of Missouri, Respondent,

v.

Anthony K. PRIMERS, Appellant.

No. WD 54038.

Missouri Court of Appeals,
Western District.

July 28, 1998.

Emmett D. Queener, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for Respondent.

HANNA, Presiding Judge.

On December 17, 1996, the defendant, Anthony Primers, was found guilty of first degree robbery, § 569.020, RSMo 1994, by a jury in the circuit court of Jackson County. He was acquitted of armed criminal action, § 571.015, RSMo 1994. He was sentenced to ten years imprisonment. The defendant appeals, claiming that the trial court did not maintain neutrality by putting itself in the position of the state's advocate.

The robbery victim, Karl Knief, arrived home from work on May 14, 1996, at 12:30 A.M., after finishing his shift at midnight. He parked behind his apartment at 4202 Harrison Street. He was retrieving a radio from the passenger side of his car when he heard footsteps running behind him. Mr. Knief turned, and saw a man run up to him and stop. The man said "give me your wallet." As Knief reached into his back pocket, the man cocked a large automatic handgun with his left hand, raised and pointed it at Knief. Knief held out his wallet, the man took it, and told him "if I see any police I'm going to kill you." He then turned and ran from the parking lot.

Knief locked himself into his apartment. After speaking with a friend on the phone, he called "911" at 12:45 A.M. During "a kind of long conversation" with the dispatcher, he described what happened and requested that the police respond. Shortly after he hung up the phone, Knief heard a police helicopter overhead. The helicopter received the call at 12:55 A.M., and arrived at the scene of the crime within a minute or two, which put the helicopter at the scene approximately 15 to 25 minutes after the robbery occurred. The helicopter began to fly in a grid pattern up and down the streets looking for someone matching the description of Knief's assailant. Officer McCrea, an observer in the police helicopter, was told that the suspect was a black male, wearing a green top and black pants, armed with an "assault-type weapon," and running east from the scene. McCrea saw an individual, later identified as the defendant, walking north in the 42nd block of Troost. McCrea described the man as wearing a green top and dark pants. McCrea did not see a weapon. He waited until police cars got to the area, and then shined the helicopter's spotlight on the defendant.

The defendant crossed the street and walked through the parking lot of Church's Chicken restaurant. At this point, according to McCrea, the defendant began walking faster. He crossed another street, and then walked under some trees next to an apartment building. McCrea lost sight of the defendant when the defendant went under the trees.

Two ground unit officers arrived and began searching the area. One of the officers found the defendant on the west side of the apartment building, hiding in a doorway. The defendant was searched, taken into cus-

tody, and placed in a paddy wagon. The officers then canvassed the area and the path that the defendant took from the time the helicopter first spotted him, to the point of his arrest. No weapon, wallet, or cash in the denominations that were stolen, were found on the defendant, nor were they found on or near the path he travelled.

An officer went to Knief's apartment, and told him that they had a suspect in custody. The officer transported Knief in a police car to the paddy wagon where the defendant was standing in handcuffs. The officer shined his car's headlights on the defendant. Knief identified the defendant as the man who robbed him. The defendant was then placed in the paddy wagon. Knief wanted a closer look. He looked through the back window of the paddy wagon. A spotlight was shined on the defendant's face and Knief stated "yes, without a doubt" that it was his assailant. Knief said that it was "the same eyes, the same mouth, the same jaw, the same shirt, the same pants."

While Knief was there, an officer showed him a coat found in a dumpster near the scene, and asked if it was the coat that the defendant was wearing. At some point, Knief had told the police that the robber had pulled an assault-type weapon from under his coat. He told the police, apparently incorrectly, that the coat that the police had retrieved from the dumpster looked like the one that the robber was wearing. At trial, he explained that he mistakenly told the officer that the gun was pulled out from under a coat because "[t]here was a coat presented to me, and I didn't remember the coat being there." He further testified that he told the officer that the assailant had a coat on because "I thought he might have a coat on when it was mentioned to me that he was wearing one." He testified that he later realized that his assailant was not wearing a coat.

At trial, Sue Sharp (the mother of the defendant's brother's girlfriend) testified that the defendant was at her house on the night of the incident, helping his brother move in. She testified that he was there from the time she got home from work at 11:10 P.M., until she went to bed at 12:30 A.M. She testified

that the defendant was wearing a black sweatshirt and dark blue jeans. This information was confirmed by a photograph taken of the defendant at the juvenile detention facility the night he was arrested.

Furthermore, Ms. Sharp testified that, after she went to bed, she heard the defendant's voice at 12:45 A.M. She indicated that she was aware of the time because her daughter, the defendant and his brother were being so noisy that she looked at the clock and yelled at them to be quiet. The state did not object to this testimony. However, on its own motion, the trial court called the parties to the bench and informed them that Ms. Sharp's testimony supported an alibi defense, which he understood was not going to be offered. After arguments, and prompting from the court, the state objected to the testimony. Accordingly, the court struck Ms. Sharp's testimony which placed the defendant at her house after 12:30 A.M.

The defendant testified that on the day of the incident he showered around noon, and changed into a black sweater and blue jeans. He testified that he did not own a green sweater. Later that evening, he left the Sharps' apartment with his brother and his brother's girlfriend. He left them and then walked alone to the apartment of another friend and stayed for about five minutes. He left his friend's apartment and was walking along Troost when he heard the police helicopter, which eventually shined its spotlight on him.

The defendant had been spotted by a police helicopter in the past, but never stopped. He testified that, therefore, he believed that the helicopter would eventually turn off its spotlight. The defendant was sixteen at the time of this incident and, when the spotlight stayed on him, he began to worry about being in violation of curfew law. He also possessed a cigar containing marijuana. His mother had told him that if he was caught on another curfew violation, she was going to leave him in the juvenile detention facility. He decided to cut between the buildings. He threw the marijuana away. The officers found him hiding in a doorway of the apartment building between the door and screen. He asked why he was being stopped, and the

officers explained that he was a suspect in a robbery. The officers repeatedly asked him where the gun was, and he told them that he did not have a gun and he did not rob anyone. He saw a police officer pull a coat out of a nearby dumpster.

In addition, there was other testimony presented unrelated to the crime charged, concerning the defendant's juvenile record, including his previous involvement with a gun and a charge of hindering and interfering with a police officer, which will be detailed in the opinion as discussed *infra*.

After the presentation of evidence, the jury found the defendant guilty of first degree robbery, and recommended a ten-year sentence. The jury acquitted him of armed criminal action. The court sentenced the defendant to ten years imprisonment.

The defendant's sole point on appeal is the assertion that the trial court plainly erred in abandoning its duty of neutrality by injecting itself into the presentation of the defendant's evidence. The state had not objected to the alibi evidence when the trial court intervened and stopped the testimony of the defendant's witness. The defendant claims that the court's unilateral action in excluding evidence of the defendant's alibi defense, without any objection from the state's attorney, resulted in manifest injustice. Although we agree that it was inappropriate for the trial court to have injected itself under these circumstances, we find that the judge's conduct did not prejudice the minds of the jury, and thereby did not deny the defendant a fair trial.[1]

■ The defendant requests plain error review pursuant to Rule 30.20. Rule 30.20 provides that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." *Id.* It is within an appellate court's discretion to grant plain error review. *State v. Frankenberg*, 876 S.W.2d 286, 288 (Mo.App.1994). We review for plain error in light of the charge of improper conduct by the trial judge.

■ At trial, Ms. Sharp testified that she had heard the voice of the defendant on the night of the incident, at about 12:45 A.M.[2] The trial court interrupted the proceedings and asked counsel to approach the bench. The trial court stated he understood that the defendant was not offering an alibi defense and that Ms. Sharp's testimony appeared to set up an alibi defense. The court excused the jury from the courtroom, and after discussing the issue with the attorneys, instructed the jury to disregard counsel's question and Ms. Sharp's answer on the issue.

The bench conference was as follows:

THE COURT: All right. Let's get first things first here. Now, I want to be sure that the Court keeps its proper role in the matter. You seem to have—you seem to have kind of grown to your chair there [assistant prosecutor]. I have no interest in making your objection for you.

DEFENSE COUNSEL: Well, I think she should have made the objection.

After further discussion about the inconsistencies of Ms. Sharp's testimony, and the defense counsel's pre-trial representation

---

1. "The remedy of disallowing an alibi witness to the defendant is almost as drastic, if not as drastic, as declaring a mistrial. The remedy of disallowing the relevant and material testimony of a defense witness essentially deprives the defendant of his right to call witnesses in his defense. This is not to say it should never be done, but it is certainly a drastic remedy that should be used with the utmost of caution." *State v. Mansfield*, 637 S.W.2d 699, 703 (Mo. banc 1982). The Mansfield court held that refusing to allow the unendorsed alibi witness to testify was "fundamentally unfair in the circumstances of this case and constitutes prejudicial error requiring the judgment to be reversed and the cause remanded for a new trial." Id. at 703–04. Mansfield, like most cases, addressed the denial of an alibi wit-

ness which has been untimely endorsed. The typical factual scenario is distinguished from the one before us, in that here the defense counsel never asked that the witness be endorsed, even after counsel became aware that the witness had evidence of an alibi defense. We simply make the point that it is counsel's duty, except in rare circumstances, to make objections. The attorneys should be allowed to try their lawsuit. The court's *sua sponte* intervention under these circumstances is not a recommended course of action.

2. Mr. Knief was robbed prior to 12:45 A.M., because the "911" call was received at 12:45 A.M.

that he would not present an alibi defense, the court asked:

> THE COURT: ... Now, are you making any requests now [assistant prosecutor]?
>
> ASSISTANT PROSECUTING ATTORNEY: Yes, I am.
>
> THE COURT: What is it?
>
> ASSISTANT PROSECUTING ATTORNEY: I would make a motion to exclude her testimony in that I was not given notice. ·

The court then struck the alibi testimony because the alibi defense had not been disclosed to the state. In response to the court's inquiry, the state requested that all of Ms. Sharp's testimony be excluded. The court stated:

> THE COURT: Here is how this matter ... will be handled. I am going to strike the last question and last answer or those words where the question and the answer produced the time which is an alibi time. I'm going to ask the jury to disregard those and not consider those in their deliberations.

The defendant claims that the trial court erred because its intrusion violated the standard of judicial impartiality which adversely influenced the jury. The state did not object to Ms. Sharp's testimony until the court intervened and prompted the state to object to the presentation of evidence. As a result, the defendant contends that the judge failed to maintain the neutrality required to ensure a fair trial.[3]

In support of his position, the defendant refers us to *State v. Easley* for the proposition that the trial judge "is not present to assist counsel in trying cases, the judge should act without a request only in exceptional circumstances." 909 S.W.2d 376, 377 (Mo.App.1995). *See also State v. L.R.*, 896 S.W.2d 505, 510 (Mo.App.1995); *State v. Dunn*, 889 S.W.2d 65, 72 (Mo.App.1994). Similarly in *State v. Drewel*, the court reviewed the trial court's failure to act and ruled that: "We do not expect trial judges to

assist counsel in the trial of a lawsuit. Too often they are accused of trying 'my law suit.' ... *Sua sponte* action should be exercised only in exceptional circumstances." 835 S.W.2d 494, 498 (Mo.App.1992).

■ In assessing the propriety of a trial court's actions, we consider whether the action was volunteered by the court, taken in response to an objection as part of a ruling, taken in the presence of the jury, or could have been construed by the jury to the prejudice of the defendant or indicate that the jury was not to reach its own determination of the facts. *State v. Hudson*, 950 S.W.2d 543, 548 (Mo.App.1997); *State v. Idlebird*, 896 S.W.2d 656, 665–66 (Mo.App.1995)(citing *State v. Ross*, 857 S.W.2d 375, 378 (Mo.App. 1993)). The ultimate issue to be determined is whether the judge's "conduct [was] such as to prejudice the minds of the jury against [the] defendant thereby depriving defendant of a fair and impartial trial." *State v. Davis*, 653 S.W.2d 167, 177 (Mo. banc 1983)(citing *State v. Mitchell*, 622 S.W.2d 791, 798 (Mo. App.1981)), or, as stated in *State v. Jones*, the test "is whether the remarks of the trial court could have prejudiced the jury against the defendant." 921 S.W.2d 28, 33 (Mo.App. 1996).

■ "The trial court must maintain a position of absolute impartiality, avoid any conduct which might be construed as indicating a belief on the part of the judge as to the guilt of defendant and the court should not demonstrate hostility toward the defendant." *State v. Mitchell*, 622 S.W.2d 791, 798 (Mo.App.1981)(quoting *State v. Puckett*, 611 S.W.2d 242, 244 (Mo.App.1980)). An appellate court should never hesitate to take appropriate action whenever it determines that there is an abuse of the trial court's neutrality. *State v. Davis*, 653 S.W.2d at 177.

In *State v. Idlebird*, the judge's comment was critical of defense counsel's "long questioning." 896 S.W.2d at 666. The comment was volunteered, and not made in response to an objection. However, the comment did not express an opinion as to the content or

---

**3.** The defendant has framed the first issue in the context of the judge's neutrality and whether, by the judge's actions, the jury was influenced and, as a result, denied him a fair trial. The defen-

dant does not argue that he requested, and the court denied him, the right to present an alibi defense.

truthfulness of the evidence; the judge simply indicated that some cross-examination questions were lengthy. *Id.* As such, "[e]ven were this error, and we do not find that it was, it was not prejudicial." *Id. See also State v. Hudson* where the court held that the trial court's use of the word "ridiculous" in describing defense counsel's cross-examination did not rise to manifest injustice. 950 S.W.2d at 548.

In *State v. Swigert,* the defendant complained that the trial court unduly injected itself into the questioning of the state's witness, and assumed the role of an advocate, by clarifying the testimony of a state's witness. 852 S.W.2d 158, 160 (Mo.App.1993). The *Swigert* court held that although it is the "trial judge's duty to maintain a position of absolute neutrality and an impartial attitude in his conduct and demeanor," there is no error under plain error review "as long as the trial judge does not express an opinion as to the nature, content or truthfulness of evidence." *Id.*

In *State v. Newberry,* the defendant claimed that the trial court erred in suggesting to the prosecutor, outside of the hearing of the jury, that he have his witness explain the significance of the presence of spermatozoa found on the victim. 605 S.W.2d 117, 124 (Mo.1980). Under plain error review, the Missouri Supreme Court noted that the trial court brought the subject up out of the presence of the jury, and provided an opportunity for objection. *Id.* Thus, those cases involving court comments or inquiries in the presence of the jury were inapplicable. The court held that a trial court's remarks or suggestions outside of the presence of the jury do not have such an effect. *Id.*

This court, following the analysis in *Newberry,* held that the trial court's action did not place the judge in the role of advocate for the state in *State v. Cannon,* 692 S.W.2d 357, 360 (Mo.App.1985). The trial court indicated that it would be helpful for a witness to indicate the condition of exhibits as they were retrieved from a vault. *Id.* The court's suggestion, made outside the hearing of the jury, was deemed not to be "improper assistance to the state's case" because:

Ordinarily it is not improper for [the court] to make suggestions to parties or counsel as to procedure in the action ... as by calling attention to omissions in the pleadings or defects in the evidence.

*Id.* (quoting *State v. Johnson,* 454 S.W.2d 27, 30 (Mo.1970)). The *Cannon* court ruled that the defendant "was not denied a fair trial by the court's comments made outside the hearing of the jury." 692 S.W.2d at 360.

▉ Clearly, a trial judge has a duty to remain impartial and should not generally assist counsel in the trial of the case. A trial court should suggest objections to an attorney only under the rarest circumstances, as to do so will call into question the judge's neutrality. The judge in the case before us should not have intervened, and, under these circumstances, his actions were improper. However, the judge's reaction to Ms. Sharp's unexpected testimony did not, standing alone, result in a denial of a fair trial to the defendant. The attorneys were called to the bench. There is no indication that the jury was aware of the discussion, or its purpose. Furthermore, we are influenced by the fact that the defense counsel admitted that he told the court and the prosecutor that he would not present an alibi defense. Therefore, the court's conduct did not so impress or influence the jury that it was a factor in determining the defendant's guilt. Thus, there is no finding of manifest injustice pursuant to plain error review. We are constrained to hold that the court's neutrality, from the jury's view, was not impaired. Point denied.

▉ Plain error review, however, provides that plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom. Rule 30.20. Plain error and prejudicial error are not equivalent terms. *State v. Miller,* 604 S.W.2d 702, 706 (Mo.App. 1980). Plain error is prejudicial error "which so substantially affects the rights of an accused that 'manifest injustice' or miscarriage of justice inexorable results if left incorrected." *Id.* Even if not raised on appeal, an issue may be reviewed for plain error, when the court finds that manifest injustice or a

miscarriage of justice has resulted. *State v. Rehberg,* 919 S.W.2d 543, 551–52 (Mo.App. 1995). This court may remand the case by exercising "the inherent power of the courts to prevent the miscarriage of justice." *State v. Nguyen,* 880 S.W.2d 627, 636 (Mo.App. 1994). *See also McCauley v. State,* 866 S.W.2d 892, 893 (Mo.App.1993). The existence of plain error must be dealt with on a case-by-case basis and "rebalanced each time against the particular facts and circumstances of each case." *State v. Frankenberg,* 876 S.W.2d at 288 (quoting *State v. Miller,* 604 S.W.2d at 706). *See also State v. Zindel,* 918 S.W.2d 239, 241 (Mo. banc 1996); *State v. Wilkerson,* 948 S.W.2d 440, 442 (Mo.App. 1997).

The defendant took the stand in his own behalf. On direct examination defense counsel questioned the defendant as to whether he "[e]ver had anything dealing with a gun?" The defendant denied having anything to do with a gun. The assistant prosecuting attorney, on cross-examination, asked the defendant if the police had not "arrested you with a gun" on an earlier occasion when his brother was arrested at their mother's home. He denied knowing anything about a gun at the time of his brother's arrest. In fact, he claimed that he knew nothing about the gun until the subject was brought up by the prosecutor on cross-examination.[4] The defendant was also asked on cross-examination about the events of his brother's arrest at the mother's house, which the defendant recalled, and, specifically, whether he was arrested at that time for hindering and interfering with the arrest of his brother. He denied he was arrested for interfering with the police officer.

■ "A defendant who elects to testify in his own behalf may be contradicted and impeached as any other witness." *State v. Moss,* 700 S.W.2d 501, 505 (Mo.App.1985). The scope of permissible cross-examination is dependent on the facts and background of the particular case. *Id.*

The defendant's denials led to the state's presentation of rebuttal evidence, which was received without objection, from Officer William Warren, who testified for over 25 pages about the incident at the home of the defendant's mother that day. The officer's testimony covered a wide range of events, in addition to the gun found in the upstairs bedroom, and the defendant's interference with the police officer's arrest of his brother. Both the gun and interfering incidents tend to show evidence of other crimes. Both events were used solely to impeach the defendant and had no purpose independent of impeachment. *See State v. Goodman,* 738 S.W.2d 470, 473–74 (Mo.App.1987). Other than the testimony concerning the defendant's involvement with the gun, the rebuttal evidence was of dubious relevancy; however, all of it was clearly collateral evidence. *Id. State v. Payton,* 581 S.W.2d 384, 386 (Mo. App.1979).

■ Our inquiry is premised upon the principle that "the dangerous tendency and misleading probative force of [evidence of other distinct crimes] require that its admission should be subjected by the courts to rigid scrutiny." *State v. Holbert,* 416 S.W.2d 129, 132 (Mo.1967). This is because a "defendant has the right to be tried only for the crime or crimes with which he is charged." *State v. Shaw,* 636 S.W.2d 667, 671 (Mo. banc 1982). "Evidence of unrelated crimes is prejudicial because it may result in a conviction for crimes not charged," *State v. Parker,* 886 S.W.2d 908, 922 (Mo. banc 1994), and such proffered evidence violates the defendant's right to be tried only for the charged offense. *State v. Hornbuckle,* 769 S.W.2d 89, 96 (Mo. banc 1989) (citations omitted). The result is that "[t]he admission of evidence of offenses unrelated to the cause on trial breaches [the right to be tried for the crimes charged] because it may result in a conviction founded upon crimes of which the defendant is not accused." *State v. Shaw,* 636 S.W.2d at 671. Moreover, the strength of the state's case is a prime consideration in

---

4. In her attempt to show that the defendant was aware that there was a gun involved at the time his brother was arrested, the assistant prosecuting attorney asked the defendant, without objection, about the juvenile court hearing wherein the juvenile division waived its jurisdiction and certified Primers to stand trial as an adult, inferring that he had, at least, heard evidence about the gun at that time.

whether there was manifest injustice or miscarriage of justice. *State v. McKinley,* 689 S.W.2d 628, 633 (Mo.App.1984).

Officer Warren's rebuttal testimony was that he and his partner were members of a tactical response team, much like a SWAT team, "working gun suppression" on December 21, 1995. They pulled in behind a car driven by the defendant's brother, Sirron Primers. Sirron Primers stopped his car at his mother's house and got out. Officer Warren placed Sirron Primers under arrest for a traffic violation, and handcuffed him. Officer Lemon, Warren's partner, identified one of the passengers as an individual who was known to the police and who they had arrested before. The passenger made "a furtive motion," according to Officer Warren, causing a struggle between Lemon and the passenger. Warren went to help Lemon. Sirron Primer, who was handcuffed, ran into his mother's house. Warren followed and kicked in the front door and ran into the house. He then testified that the defendant grabbed his arm, attempted to push him away, and yelled *obscenities* at him. Warren arrested the defendant for hindering and interfering with a police officer. At some point, Warren found a dark-colored .22 caliber gun in the upstairs, northeast bedroom of the mother's house. Warren testified that he questioned the defendant about the gun and he *denied that it belonged to him or any* other family member. The defendant was not charged, nor referred to juvenile court for possession of the gun. In fact, there was no showing that the defendant owned or was connected with the gun.

The rebuttal evidence was offered under the guise that the defendant had denied that he had anything to do with the gun or hindered the officer during the arrest of his brother. The question of the gun was first raised during the defendant's direct examination. The hindering and interfering charge was first introduced by the state on cross-examination. The admission of both pieces of rebuttal evidence, under the circumstances, was error and, as discussed *infra,* denied the defendant a fair trial.

■■■■ The evidence that the defendant was hindering and interfering with the official duties of a police officer at his mother's house, was not relevant to the issues in the case. The evidence was used solely to impeach and, thus, was a collateral issue. *State v. Goodman,* 738 S.W.2d at 473–74. Because the matter was first advanced by the prosecutor, the state is bound by the defendant's answers on cross-examination. *Id; State v. Dunlap,* 706 S.W.2d 272, 274 (Mo.App.1986). The defendant did not invite the impeaching evidence during his direct examination. "[T]he general rule prohibits evidence of an accused's involvement in another crime." *State v. Panter,* 536 S.W.2d 481, 485 (Mo. App.1976). If the defendant testifies on his own behalf and, for purposes of impeachment, is cross-examined on collateral matters, his answers to such inquiries are conclusive. *Id.* Furthermore, such matters are not subject to rebuttal evidence. *Id.* The evidence that the defendant hindered the police officer in the arrest of Sirron Primers was inadmissible as the state was bound by the defendant's answer on cross-examination.

■■■■ With respect to the evidence of the gun, defense counsel asked the defendant, on direct examination, if he had previously been involved with a gun. The defendant's direct examination opened the door to cross-examination as well as to rebuttal evidence to impeach his denial. *State v. Dunlap,* 706 S.W.2d at 274 (analyzing *State v. Panter,* 536 S.W.2d 481 (Mo.App.1976)). *See also State v. King,* 342 Mo. 975, 119 S.W.2d 277 (1938); *State v. Dale,* 874 S.W.2d 446, 453 (Mo.App.1994); *Mische v. Burns,* 821 S.W.2d 117, 119 (Mo.App.1991); *State v. Parson,* 815 S.W.2d 106, 109 (Mo.App.1991); *State v. Higginbotham,* 765 S.W.2d 352, 356 (Mo.App.1989); *State v. Cheesebrew,* 575 S.W.2d 218 (Mo.App.1978). When a collateral issue is first tendered by the defense in direct examination or is volunteered on cross-examination, it becomes a proper subject for rebuttal. *State v. Panter,* 536 S.W.2d at 485. Otherwise, a defendant would be free to testify to any matter concerning his good character and then simply deny on cross-examination any questions about matters reflecting on his character. *State v. Dunlap,* 706 S.W.2d at 276.

However, the state's rebuttal testimony did not refute the defendant's testimony that

he had not been involved with a gun. Warren testified that the gun was found in the house. The officer acknowledged that the defendant did not possess the gun during the incident.[5] The defendant was never charged with any crime associated with the weapon. The rebuttal evidence fell short of proving that the defendant was involved with a gun. The result is that the state tainted the defendant with a gun, in a case where he was charged with armed robbery and in which no weapon was found. If there was a lack of good faith by asking the defendant about the gun on cross-examination, the lack of good faith was confirmed by the state's rebuttal evidence.

■ Early on Missouri courts recognized that there must be a good faith or reasonable basis to ask a question with negative implications such as here. *State v. Willard*, 192 S.W. 437, 440 (Mo.1917). *See also State v. Creason*, 847 S.W.2d 482, 486 (Mo.App.1993). A prosecuting attorney transcends the limits of the scope of cross-examination if the question asked is only for the "purpose of improperly showing other crimes or for the purpose of going into collateral details." *State v. Creason*, 847 S.W.2d at 486. The state's cross-examination about the gun, and the interference with a police officer, was error. Furthermore, the prejudicial effect of a gun, particularly where the crime charged is armed robbery and no weapon is found, can be highly prejudicial. *See State v. Jones*, 583 S.W.2d 212, 214 (Mo.App.1979). Whether the error results in manifest injustice or miscarriage of justice, may differ from one case to the next because of variant facts and circumstances. *State v. Miller*, 604 S.W.2d at 706.

■ Having considered the two pieces of evidence and determined that their admission was in error, we weigh the prejudicial effect of the evidence. It was on those two incidents, the gun and the hindering charge, that the state justified its rebuttal evidence.

As a result, the jury was subjected to extensive rebuttal evidence, very little of which was remotely related to the gun or hindering charges. A good deal of the rebuttal evidence was related to the antics and arrest of the defendant's brother and his companion.

In summary, the state's rebuttal evidence was that two SWAT-like police officers, on a "gun suppression program, in a high crime neighborhood in which the defendant lived," [6] were involved in an arrest of the defendant's brother, which escalated into an attempted escape as he tried to evade the arrest, and a struggle and arrest of an individual with an unsavory reputation with the police. Mixed in this evidence was the testimony concerning the hindering and interfering charge against the defendant, and the recovered gun, which was never connected to the defendant.

The entire rebuttal evidence illustrates that substantial justice was denied the defendant, resulting in manifest injustice. This is particularly so when the rebuttal evidence is balanced against a submissible, but fragile case of guilt. The strength of the state's case is a prime factor in the determination of whether a trial court error resulted in manifest injustice or miscarriage of justice. *State v. McKinley*, 689 S.W.2d at 633. The rebuttal evidence did not serve to either rebut the defendant's evidence, nor was the majority of it remotely connected to the crime charged or the defendant. As such, the testimony was improper. Substantial justice was denied the defendant resulting in manifest injustice.

The judgment of conviction is reversed, and the case remanded for a new trial.

LAURA DENVIR STITH and EDWIN H. SMITH, JJ., concur.

---

5. Although the was not a scintilla of evidence that the defendant had the gun at any time, the officer testified that at one time during the fracas in the house, he lost sight of the defendant and if "he had a gun, he could have got rid of it." The officer's testimony left the impression that the defendant may have had a gun, which had no basis in fact.

6. The officer's testimony was that the area where the defendant lived was identified as an area "where some of the violent crimes, for instance, robberies, aggravated assaults, handgun arrests, have happened. . . . "