STATE of Missouri, Respondent,

v.

Glen E. McGOWAN, Appellant.

No. ED 85114.

Missouri Court of Appeals,
Eastern District,
Division Four.

Feb. 28, 2006.

Amy M. Bartholow, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Lisa M. Kennedy, Assistant Attorney General, Jefferson City, MO, for respondent.

MARY K. HOFF, Judge.

Glen E. McGowan (Defendant) appeals from the judgment entered following a jury verdict convicting him of tampering with a motor vehicle, first degree, in violation of Section 569.080 RSMO 2000.[1] The trial court sentenced Defendant to a term of ten years' imprisonment.

The record, as pertinent to the points on appeal, reveals the following. On March 20, 2003, at approximately 6:20 a.m., an individual going by the name of Charles Brown[2] (Brown) stole a red and white 1992 Chevrolet S10 truck (Chevy truck) belonging to Ocbai Tekla by breaking the steering column and bypassing the ignition.

On March 22, Brown used the stolen Chevy truck to pick up his girlfriend, Sharon Malone (Malone), and Barbara Bost (Bost). Brown, Malone, and Bost drove around for a few hours doing drugs and then proceeded to Defendant's house around 3:00 a.m. After sleeping at Defendant's residence, Brown, Malone, and Bost did more drugs. Defendant, Brown, Malone, and Bost then decided to drive the Chevy truck to Columbia, Missouri, to party. Defendant and Bost sat in the back of the Chevy truck, and Brown and Malone sat in the front. After the four individuals ate at White Castle, Brown, Malone, and Bost bought more drugs, and the three of them used the drugs during the trip to Columbia.

En route to Columbia, the four individuals stopped in Wentzville. Brown got into a black Ford F150 truck (Ford truck) that was parked at a lumber yard, and Malone joined him. Defendant and Bost then moved to the front seat of the Chevy truck, and Bost drove. Bost started nodding off so she asked Defendant to drive. Bost pulled over, and Defendant started driving the Chevy truck. Bost "figured" the Chevy truck was stolen because Brown always had different trucks.

Trooper Mark Broniec (Broniec) received a dispatch regarding a stolen black Ford truck. The dispatch provided Broniec with the Ford truck's license plate number. Broniec proceeded to a crossover on Interstate 70 (interstate) just east of the Warrenton exit and parked there to watch for the Ford truck. Shortly thereafter, the Ford truck passed Broniec's parked car. Broniec followed the Ford truck, activated his lights, and attempted to stop the Ford truck. The Ford truck exited the interstate, abruptly stopped approximately one-third of the way up the exit ramp, and Brown exited the vehicle. Broniec stopped his vehicle behind the Ford truck, got out of his vehicle, drew his pistol, and pointed it at Brown and Malone. Brown ran across the median to the westbound lane of the interstate. Malone headed in the opposite direction for the service road. Broniec arrested Malone but lost sight of Brown.

Nicole Barnes (Barnes) was traveling on the interstate on March 22. She exited at Truxton and observed a patrol car stopping behind a dark truck. As she watched, Broniec exited his vehicle and drew his gun. Barnes saw the driver and the passenger of the dark truck exit the truck. The driver and passenger began

1. All subsequent statutory citations are to RSMo 2000, unless otherwise indicated.

2. Brown uses several aliases, including "Red," "Charlie Brown," "James Gillespie," and "Moody." He will be referred to in this opinion as "Brown."

running in opposite directions. When Barnes realized Broniec was chasing the passenger, Barnes opened her door, stood on her car, and watched the driver run to the interstate where he proceeded to jump into the bed of a small red and white truck sitting on the left shoulder under the overpass. The truck then drove away.

After Broniec arrested the passenger, Barnes told him what she had observed. Broniec called in a description of the red and white truck to his headquarters and told the dispatcher that the truck was driving westbound on the interstate. When Broniec searched the Ford truck, he seized substances later identified as marijuana and cocaine.

Trooper Maddox (Maddox) parked at a cross-over point on the interstate to watch for the red and white Chevy truck. When Maddox spotted a vehicle fitting the truck's description, he pulled out behind it and activated his lights. The Chevy truck exited at a ramp, and Maddox followed. The truck came to a complete stop at the top of the exit ramp. Maddox stepped out of his vehicle with his shotgun and directed Defendant, who was driving the truck, to turn off the Chevy truck's engine and to throw the keys outside the truck. When Defendant did not immediately comply, Maddox repeated his order. Defendant opened the truck's door and yelled that there were no keys. Bost and Brown were in the truck with Defendant.

Maddox subsequently learned the Chevy truck had been reported as stolen. Maddox, with the assistance of other law enforcement officers, arrested Defendant, Bost, and Brown. The officers searched the Chevy truck and recovered items that appeared to be contraband. Among these items were substances later identified as codeine and cocaine. While searching the Chevy truck, Maddox noticed the steering column of the truck had been broken so the mechanism could be manipulated to bypass the ignition. When one of the other officers asked Defendant where he was going, Defendant told him that he had just met Bost and that he and the others were going to Columbia for a party. Defendant indicated to the officer that Brown had provided him with the Chevy truck. Brown subsequently showed Maddox how to start and stop the Chevy truck using a screw driver.

The State charged Defendant with two counts of possession of a controlled substance and one count of tampering in the first degree. Bost testified at Defendant's trial. During Bost's testimony, the State elicited from her that she had pleaded guilty to all of the crimes for which Defendant was being tried.

Malone also testified at Defendant's trial. During her testimony, the State elicited that Malone had pleaded guilty to tampering in connection with the Ford truck and to possession of heroin and cocaine. Malone knew the Chevy truck was stolen but had not told Defendant that it was.

During Maddox's testimony before the jury, Defendant interjected, "He's lying." At that point the State addressed Defendant and asked, "[Defendant], did you want to take the stand?" Defense counsel asked to approach the bench and requested a mistrial based on the State's reference to Defendant's election not to testify. The court denied the request and indicated that it would rather not highlight the remark to the jury by referring to it again. Defense counsel stated, "I'd rather it not be highlighted to the jury." The court warned the State regarding its behavior, and the State replied, "... This is the second time today [Defendant] has spoken up in the middle of the trial. If he needs to speak in this trial then he needs to take the stand. It's not appropriate for him to make comments, questions, answers or

anything else from the seat over here...." The court agreed and told defense counsel to speak to Defendant about making comments. Defendant did not testify.

At the close of evidence, Defendant proffered a verdict director for tampering in the first degree, which included a claim-of-right defense. The trial court refused the instruction. The jury acquitted Defendant of both drug charges but returned a guilty verdict on the tampering charge. The trial court sentenced Defendant to a term of ten years' imprisonment. This appeal follows.

■ Defendant raises three points on appeal. In his first point, Defendant claims the trial court abused its discretion in overruling his motion for a mistrial after the State asked Defendant in front of the jury, "[Defendant], did you want to take the stand?" because this question improperly commented on Defendant's exercise of his right not to testify. We find this dispositive point requires reversal. Defendant's second and third points relate to the trial court's refusal to give Defendant's proffered instruction regarding the offense of tampering in the first degree, which included Defendant's claim-of-right defense, and the trial court's failure to declare a mistrial or to instruct the jury *sua sponte* to disregard the State's elicitation from Defendant's codefendants evidence of their plea dispositions and its later reminder to the jury of these pleas during closing argument. As these issues may not arise on retrial, we decline to address them.

■ Turning to Defendant's dispositive claim of error, our standard of review for a trial court's refusal to grant a mistrial is abuse of discretion. *State v. Clark*, 112 S.W.3d 95, 100 (Mo.App. W.D.2003). This is because the trial court has observed the complained of incident and is in a better position than an appellate court to determine what prejudicial effect, if any,

the alleged error had on the jury. *Id.* We will find that a trial court abused its discretion when its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary and unreasonable as to shock our sense of justice and indicate a lack of careful consideration. *Id.*

■ Defendant argues that the State's question improperly commented on Defendant's exercise of his right not to testify. In order to keep from the jury any reference to a defendant's constitutional right against self-incrimination, Section 546.270 provides that:

> If the accused shall not avail himself ... of his ... right to testify ... it shall not be construed to affect the innocence or guilt of the accused, nor shall the same raise any presumption of guilt, nor be referred to by any attorney in the case, nor be considered by the court or jury before whom the trial takes place.

When considering a defendant's claim of an improper comment on his right against self-incrimination, we must consider the comment in the context in which it appears. *State v. Neff*, 978 S.W.2d 341, 345 (Mo. banc 1998).

■ Here, when Defendant blurted, "He's lying," while Maddox was testifying, the State asked Defendant, "[Defendant], did you want to take the stand?" Defendant asked to approach the bench, where he promptly requested a mistrial. The trial court denied the request and indicated that it would not tell the jury to disregard the State's remark. Where an objection is made and overruled, a direct reference to a defendant's failure to testify will almost invariably require reversal. *Id.* at 344; *State v. Jackson*, 792 S.W.2d 21, 23 (Mo.App. E.D.1990) (State's objection, "They're his shoes. If he wants to testify concerning the size of his shoes, he

can," found to be a direct infringement upon the defendant's right against self-incrimination that mandated a new trial). A prosecutor's use of words such as "defendant," "accused," "testify," or equivalent words constitutes a direct reference to a defendant's failure to testify. *Neff,* 978 S.W.2d at 344. We find the State's question to Defendant was a direct reference to Defendant's failure to testify.

■ We recognize that the accused may waive his statutory right to no reference to his failure to testify. *State v. Stidham,* 305 S.W.2d 7, 18 (Mo.1957). However, such a waiver usually occurs when a defendant voluntarily elects to testify under oath or when a defendant testifies though not under oath. *State v. Clark,* 759 S.W.2d 372, 373–74 (Mo.App. E.D.1988) (defendant stated in presence of the jury that he was in police custody on an unrelated matter when the crime for which he was being tried was committed; defendant's statement constituted a waiver of the privilege against self-incrimination and any comment as to defendant's failure to testify in support of this statement was permissible); *Stidham,* 305 S.W.2d at 18 (defendant took stand in his defense; thus, his failure to deny incriminating facts was legitimate subject for state's comment in closing argument); *State v. Brannson,* 679 S.W.2d 246 (Mo. banc 1984) (defendant undertook own defense and effectively injected himself into the mainstream of the evidence; court did not reach question whether such conduct waived privilege because prosecutor's objections did not constitute direct reference). Although the State claims the Defendant's outburst was an attempt to discredit Maddox's testimony without Defendant taking the stand and argues Defendant thus waived his right to be free from the State's commenting on this failure to testify, we find that Defendant's two-word statement did not open the door to the State's direct reference.

Furthermore, considering the context of the State's question, we conclude it was improper. Although the State's comment purported to respond to Defendant's allegation of false testimony by a State witness, the State had other means available to it to curtail further unsworn comments by Defendant, including the State saying something out of the presence of the jury and requesting the court to admonish and to warn Defendant against future outbursts.

■ Additionally, we find the State's question here was not a fair response. "Where ... the [State's] reference to the defendant's opportunity to testify is a fair response to a claim made by defendant ..., there is no violation of the privilege [against compulsory self-incrimination]." *United States v. Robinson,* 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988). We note many cases conclude that a reference by the State to a defendant's failure to testify was a fair response invited by the defendant's comment or argument because the reference was found to be indirect, *see e.g., State v. Elam,* 89 S.W.3d 517, 525 (Mo.App. W.D.2002) (finding no intent to magnify defendant's failure to testify in single, ambiguous comment, which responded to defendant's allegation of inconsistent testimony); or to be not addressing the defendant's silence, *see United States v. Green,* 324 F.3d 375, 382 (5th Cir.2003) (prosecutor's comments, considered in context, were not referencing defendant's silence and were merely in response to defendant's argument that the government failed to turn over intercepted conversations); *United States v. LeQuire,* 943 F.2d 1554, 1565, 1567 (11th Cir.1991) (examined in the context in which it was made, prosecutor's statement that defendant did not "have the guts to tell it about the Colombi-

ans and get on that stand" was not manifestly intended to be a comment on defendant's failure to testify but rather intended to rebut defendant's accusation that government witnesses were liars); *People v. Kevorkian,* 248 Mich.App. 373, 639 N.W.2d 291, 329 (2002) (prosecutor's objections and comments did not constitute direct and unequivocal references to defendant's failure to testify but merely amounted to objections to defendant's repeated and improper attempts to inject facts not in evidence in to his closing statement). In contrast, we find the State's question, considered in the context in which it was made here, constituted a direct and unequivocal reference made to the jury intending to draw attention to Defendant's failure to testify. *Cf. Brannson,* 679 S.W.2d at 250.

Given Defendant's objection and the trial court's failure to take any remedial action to cure any harm the State's remark may have inflicted upon Defendant, we conclude the trial court's ruling was an abuse of discretion. *See Neff,* 978 S.W.2d at 345, 347.

In light of our holding, we decline to address the remaining points raised by Defendant on direct appeal. The judgment of conviction is reversed and the case is remanded for a new trial.

LAWRENCE E. MOONEY, P.J., concurs.

KENNETH M. ROMINES, J., dissents in separate opinion.

KENNETH M. ROMINES, Judge, dissenting.

I dissent. Glen McGowan was charged by an amended information in Warren County with Tampering in the First Degree, two counts of Possession of a Controlled Substance, and as a Prior and Persistent Offender, having been previously convicted in Dunklin County in 1993 of Forgery, and in 1995 in Dunklin County of Possession of a Controlled Substance in a County Jail. Neither appellant nor his counsel contest the sufficiency of the evidence to convict.

In the company of Charles Brown (aka Red, Charlie Brown, James Gillespie, and Moody), Sharon Malone, and Barbara Bost, McGowan was involved in an adventure across six Missouri Counties ending in Montgomery County, the objective being to "... party in Columbia ...," involving two stolen trucks, heroin, cocaine and codeine.

The record before the Judge and Jury showed beyond a reasonable doubt that: on 20 March 2003 Brown stole a red and white Chevrolet S–10 owned by Ocbai Tekla, from a Church parking lot; on 21 March Brown, with Malone, picked up Bost in the stolen S–10, did drugs, then drove to McGowan's apartment between 3:00 A.M. and 4:00 A.M.; more drugs; all who testified at trial were consistent that McGowan took no drugs; off to Columbia, Brown driving, Malone in front, Bost and McGowan in back; the S–10 was conveniently altered so that it could be operated with a screw-driver in the steering column; after the compulsory "bag of bombers" from White Castle, Brown exits I–70 at Wentzville, pulls into a lumber yard, and apparently tiring of the close quarters in the S–10, steals, in full view of McGowan, a black Ford F150, the property of Charles Marks; Brown and Malone return to I–70 in the Ford F150, with Bost and McGowan following in the S–10; starting to nod asleep Bost turns the driving duties over to McGowan; Trooper Mark Broniec is informed of the stolen Ford F150 and the plate numbers, parks his car east of the Warrenton exit, and almost immediately sees the Ford F150, the trooper pursues, catches the truck near the Truxton exit

where Brown was speeding up and weaving through traffic to avoid the trooper; with the trooper's lights on, Brown goes from the passing lane to the exit ramp beyond the normal entrance; with the trooper close behind on the exit ramp Brown and Malone bolt the truck in opposite directions and let the truck roll into the trooper's car; the trooper catches Malone, puts her under arrest and calls for back-up; Brown crosses the median and gets in the bed of the Chevy S–10 driven by McGowan and leaves the scene; Nicole Barnes sees the actions of Brown and McGowan, gives the truck's description to Trooper Broniec, who reports the vehicle and the direction being traveled; Trooper Anthony Maddox spots the vehicle as he waits in a cross-over on I–70; Trooper Maddox makes eye-contact with McGowan, McGowan crosses lanes and exits on Highway 19, the truck stops and Trooper Maddox, with weapon drawn, demands the vehicle to be turned off and the keys thrown out, McGowan responds that there are no keys, the truck was turned off with the handy screwdriver; McGowan, Bost and Brown are arrested; the troopers find heroin and cocaine in the Ford F150 and on Malone, and find cocaine and codeine in the Chevy S–10.

Trial was held in Montgomery City on 16 June 2004, ten witnesses testified, the transcript of trial contains two hundred and seventy-seven pages, ten exhibits were shown the jury, yet the majority focus is on two lines of the transcript. The majority citation to *State v. Neff*, 978 S.W.2d 341 (Mo. banc 1998), and the application of *Neff* to this case I find disingenuous.

The privilege against compulsory self-incrimination set out in the 5th Amendment, and Art. I § 19, Con. of Mo. protect against the same potential abuse: "... That no person shall be compelled to testify against himself in a criminal cause...." The history behind the inclusion of these words in our organic documents is clear: the state cannot "torture" a defendant either physically, or by compelling his own testimony.[1]

In the instant case defendant McGowan was not "compelled to testify." Though testify he did by saying "... He's lying ...," to which the response was not, "Judge this is the second time today" or "... do you want to ask the questions ...," but "... Mr. McGowan, did you want to take the stand?" These nine words do not require a new trial. I find, in the context of the trial situation facing the trial judge, the manner in which the Court responded was logical, appropriate, an exercise in prudence, and carefully done. *State v. Clark*, 112 S.W.3d 95, 100 (Mo. App.W.D.2003). There is neither a direct nor oblique reference to Defendant's guilt, nor to the fact that Defendant did not testify.

The incident *in toto* is as follows:

Q. Okay. So the thing that Mr. Gabel is trying to do here is trying to basically confuse the jury and twist it around. It's not what you said.

THE DEFENDANT: He's lying.

MR. WRIGHT: Mr. McGowan, did you want to take the stand?

MR. GABEL: Your Honor, can we approach?

(Counsel approached the bench and the following proceedings were had.)

MR. GABEL: Your Honor, I'm asking for a mistrial with the Prosecutor's

---

1. A quick but thorough history of this privilege is found in, R. Carter Pitman, *The Colonial and Constitutional History of the Privilege Against Self–Incrimination in America,* 21 Va. L.Rev. 763 (1963).

direct reference to my client's refusal to testimony. With prejudice.

MR. WRIGHT: It would not be with prejudice. We'll do it again.

THE COURT: The request for mistrial is denied. I'm going to let it pass at this point without mentioning it to the jury and telling them to disregard it.

MR. GABEL: I'd rather it not be highlighted to the jury.

THE COURT: I don't intend to highlight it but the request for mistrial is denied. Mr. Wright, let's not do that.

MR. WRIGHT: I understand. This is the second time today Mr. McGowan has spoken up in the middle of trial. If he needs to speak in this trial then he needs to take the stand. It's not appropriate for him to make comments, questions, answers or anything else from the seat over here. That is inappropriate. There's nothing I can do about it if he's going to make comments or statement.

THE COURT: Well, there's nothing I can do about it, either.

MR. WRIGHT: I understand, but that's the second time today he's made comments, questions from his seat and that's inappropriate.

THE COURT: Well, I agree with that. Mr. Gabel, I think you need to talk to your client about that.

MR. GABEL: I will talk to my client.

The prosecutor's retort was not an attempt to mislead the Jury nor to invite the Jury to misapply the Court's instructions. Indeed, the verdicts on the three submitted Counts belies that the Jury was effected at all with the by-play between the defendant and the prosecutor: the Jury returned a verdict of guilty on Tampering in the First degree, and *not guilty* of Possession of Cocaine, and *not guilty* of Possession of Codeine. It is difficult to reconcile that the Jury was misled by the prosecutor's comments as to tampering but not as to the two drug counts. The answer is of course that the prosecutor's comment had no impact on this Jury at all. The judge recognized it: "... I'm going to let it pass at this point without mentioning it to the Jury and telling them to disregard it ...", defense counsel recognized it: "... I'd rather it not be highlighted to the Jury ..."; we should recognize it.

The penchant for bright-line rules, while understandable, allows for too quick consideration based on buzz-words, as opposed to the application of rules to ever-changing factual records. This case is an example. The words here alone are damning.

The result reached does not reflect the principle set out in *Neff*. I read *Neff* to say there is no hard and fast rule, and that reliance on § 546.270 RSMo. is here misplaced:

Section 546.270 was first enacted in 1877. 1877 Mo. Laws 356. Its primary purpose was to negate the common law rule that a defendant could not testify in his own defense. *See State v. Chyo Chiagk*, 92 Mo. 395, 4 S.W. 704, 707–08 (1887). It also preserved the pre-existing constitutional prohibition against commenting on a defendant's exercise of his right to remain silent.

By its terms, this statute does not mandate a mistrial in every case where there is a reference, direct or otherwise, to a defendant's failure to testify. Neither has this Court held that a direct reference always requires a mistrial. For example, it is hard to imagine a more direct reference to the defendant's failure to testify than for the trial court to give a jury an instruction on the subject. ...

No sound historical argument, rooted in the statute or the precedent of this Court, supports the sweeping claim that

regardless of the circumstances, a direct reference to the defendant's failure to testify mandates a mistrial.

*Neff,* 978 S.W.2d at 344–45.

These words from *Neff* neither compel nor condone the result reached.

Purists we are not else why allow confessions; fingerprints; blood tests; DNA samples; and the removal of foreign objects from a defendant. All surely are a more direct attack on the defendant's right not to be compelled to testify than the words in context in the present case.

Simply put, we look for legal error, that means error of the judge. The majority states the standard correctly as *State v. Clark,* 112 S.W.3d 95 (Mo.App. W.D.2003). The Circuit Judge in this cause had heard twenty-six years worth of trials as a Judge before 16 June 2004, the response in this cause was not illogical but prudent; the ruling was fair and understood as such by counsel; justice was served not shocked.

Defendant raises two additional claims of error: the first is the refusal of Instruction A. Defendant sought his own verdict director based on MAI–CR3d 323.22. The form chosen by Defendant was a special negative defense which requires affirmative evidence of claim of right. As the Trial Judge recognized this evidence did not exist, thus no error; the remaining claim is brought by appellate counsel, not trial counsel. Appellate counsel now urges, with no contemporaneous objection at trial, plain error review of testimony of Bost and Monroe as to the disposition of the crimes to which they pled from this same incident.

There is simply no error. Trial counsel for Defendant must have believed Christmas was early when Bost and Malone testified as to their involvement and plea dispositions on direct by the prosecuting attorney. Defendant's counsel clearly used this testimony to achieve two not guilty verdicts. A clearer example of trial strategy for not making an objection would be difficult to find.

In sum, two good young and aggressively competent young lawyers, a Trial Judge of twenty-six years, and a Jury met in Montgomery City and produced a fair result after a fair Trial. This case should be affirmed.

I dissent.