STATE of Missouri, Plaintiff–Respondent

v.

Stanley Harold Roger COE, Defendant–Appellant.

No. 28098.

Missouri Court of Appeals, Southern District, Division One.

Sept. 19, 2007.

S. Kathleen Byrnes–Ales, Carthage, for Appellant.

No appearance for respondent.

JOHN E. PARRISH, Judge.

Stanley Coe (defendant) was convicted, following a jury trial, of the class A misde-

meanor of criminal nonsupport.[1] § 568.040.[2] Defendant was found guilty of failing to provide adequate support for his three children during part of 2005. This court affirms.

Before addressing the merits of this appeal, this court notes the failure of the state to file a respondent's brief notwithstanding the requirement of § 56.060.1 that:

[i]f any misdemeanor case is taken to the court of appeals by appeal the prosecuting attorney shall represent the state in the case in the court and make out and cause to be printed, at the expense of the county, all necessary abstracts of record and briefs, and if necessary appear in the court in person, or shall employ some attorney at the prosecuting attorney's own expense to represent the state in the court. . . .

*State v. Bowlin,* 850 S.W.2d 116 (Mo. App.1993), explains the problem this presents.

Our review of this case is not aided by the State's failure to file a brief. No penalty is prescribed for failure to file a brief on an appeal of a misdemeanor conviction. *State v. Harrington,* 679 S.W.2d 906, 907 (Mo.App.1984); *State v. Michaels,* 543 S.W.2d 245, 247 (Mo.App. 1976). However, this leaves us with nothing presented other than the . . . arguments of defendant. It is not the function of the appellate court to serve as advocate for any party to an appeal. When one party fails to file a brief, the court is left with the dilemma of deciding the case (and possibly establishing precedent for future cases) without the benefit of that party's authorities and points of view. Appellate courts should not be asked or expected to assume such a role. *Thummel v. King,* 570 S.W.2d 679, 686 (Mo.banc 1978).

*Id.* at 116–17. As observed in *State v. Harrington,* 679 S.W.2d at 907, "[W]e cannot understand why a prosecutor would neglect his statutory duty to see that the state was adequately represented through the entire criminal proceeding."

*Facts*

Defendant and Linda Coe (mother) were married in December 1986. The marriage was dissolved in September 2003.[3] They have three children; two daughters, ages 17 and 12 at the time of trial, and a son, age 16 at the time of trial. The dissolution judgment awarded joint custody. Neither party was ordered to pay child support to the other. In March 2004, mother filed a motion to modify the dissolution judgment. The judgment was modified and defendant was ordered to pay child support in the amount of $417 per month. Thereafter, during the period from May 1, 2004, to May 1, 2005, mother received no support for the children directly from defendant or any in-kind support from him. As discussed hereafter, some child support was received from the Family Support Center.

Defendant was ordered to provide health insurance for the children. He did so while employed by General Mills. That employment terminated July 17, 2004. Defendant provided no health insurance after that.

---

1. Defendant was charged with felony criminal nonsupport, *see* § 568.040.4, but was found guilty of the lesser included class A misdemeanor offense.

2. References to statutes are to RSMo 2000.

3. The assistant prosecuting attorney, in a question asked mother, referred to the date of the dissolution judgment as "November of 2003." For purposes of this proceeding, whether the date of the dissolution judgment was September 2003 or November 2003 is of no consequence.

Two witnesses with the same name, David Reed, testified on behalf of mother. The witnesses are not related to one another. The first to testify was David Reed, Sr., mother's uncle. Mr. Reed, the uncle, told the court and jury that he had been present at the courthouse for one of the hearings involving the parties to this appeal. He was asked if he had occasion to hear any statement made by defendant after the hearing had taken place. He answered, "Yes, sir." Defendant was in the courthouse coming down the steps to the first floor. Mr. Reed said defendant appeared "[m]ad. Upset." He told the court and jury that defendant cursed; that he said, "I am—I am not going to pay no GD child support."

The second to testify was David Reed, a social worker employed by the Missouri Family Support Division, Child Support Enforcement, as a Child Support Enforcement Technician.[4] According to Mr. Reed, defendant was ordered to pay child support by court order dated May 3, 2004. The order was retroactive to the date mother's motion to modify was filed, April 1, 2004. Defendant was ordered to pay $417 per month. Payments were received from or on behalf of defendant on the following dates in the following amounts. The payments were made to the Family Support Payment Center, Jefferson City, Missouri.

| | |
|---|---|
| June 2004 | $682.56 [5] |
| July 2004 | 470.76 [6] |
| November 2004 | 51.00 |
| December 2004 | 101.00 |
| January 2005 | 51.00 |
| February 2005 | 51.00 |
| March 2005 | 23.31 |

No payments were received in May 2004, August 2004, September 2004, October 2004, or April 2005.

Defendant was enrolled in the Parent's Fair Share Program in 2004. That program is run by Child Support Enforcement and another agency.[7] Mr. Reed was asked, "Did [defendant] contact you, or did your worker contact—contact [defendant] about joining Parent's Fair Share?" He answered that defendant was sent a notice telling him that his licenses—his driver's license, his hunting and fishing licenses, any professional licenses he might possess—could be suspended if he did not contact Child Support Enforcement. Defendant contacted the agency after receiving the notice.

Mr. Reed explained that once Child Support Enforcement is contacted, they refer the individual to Workforce Development. The individual must attend an orientation about the program and enroll in it. A temporary payment plan is then put in place. Defendant's temporary payment

---

4. Mr. Reed explained the function of the Family Support Payment Center. He stated, "It is a central collection system in the state of Missouri that all child support payments are supposed to be made to, and that is the-the Family Support Payment Center is charged with the distributing, and-and keeping the records of the payments."

5. An income withholding order had been issued by the trial court May 21, 2004, while defendant was employed by General Mills. The Family Support Payment Center received $173.80 on June 2, $169.25 on June 7, $173.30 on June 14, and $166.21 on June 21.

6. The Family Support Payment Center received $117.69 on July 2, $117.69 on July 12, $117.69 on July 19, and $117.69 on July 26.

7. The trial record was made by a magnetic tape-recording device. The name of the other agency does not appear in the transcript. It appears to have been identified by the witness; however, a "transcriber's note" states, "Tape 1071 ended and Tape 1071–A picked up with the testimony of Mr. David Reed." Unfortunately, mechanical methods of recording testimony do not possess the ability, as with a court reporter, to assure testimony does not get omitted in such instances.

program directed that he pay $51 per month during his participation in the program.[8] That was the minimum that defendant would have to pay to stay eligible for the program and remain enrolled in it. If a participant in the program does not pay, he or she is terminated from the program. Mr. Reed was asked the following questions and gave the following answers about defendant's participation.

Q. Was [defendant] eventually kicked out of the program?

A. Yes, he was.

Q. What for, and when?

A. He was kicked out of the program for noncooperation in March of-actually, he was sent warning letters in March. He was formally kicked out of the program in May of 2005.

Q. Okay. The $101 in December, did [defendant] pay $101 in one payment?

A. Not in one payment. We received one payment during the first of December, and then another payment during the last week of December.

Q. One was 51 and one was 50?

A. That is correct.

Q. And the January payment, was that made right after the payment in December?

A. No, it was made toward the end of the month.

Q. And what about the February payment? The first part of February, right after the January payment?

A. It was made toward the end of the month also.

Q. All right. Where does the 23.31 come for—from in March of '05?

A. That was where, after he—Parent's Fair Share sent him to truck driv-

ing school to get his CDL. He was driving for KTL, and that was from the income upon where we had did [sic] to KTL.

Mr. Reed told the court and jury that defendant got his CDL and went to work for KTL; that he worked for KTL from December 18, 2004, until March 28, 2005. After defendant received his CDL, Parent's Fair Share began the process of increasing defendant's temporary payment plan from $51 to $101. An income withholding order was issued to KTL for $101 per month. It was mailed March 7, 2005. Payment for one week, the $23.31, was received before defendant's employment with KTL terminated.

### Points on Appeal

■ Defendant's first point on appeal is directed to testimony by social worker David Reed that he understood that defendant voluntarily left his employment with General Mills. Defendant argues that it was error to admit the testimony because it was hearsay. As best that this court can discern, the testimony to which Point I is directed occurred during the state's examination of Mr. Reed in its case in chief. The transcript reflects the following.

Q. Do your records indicate when [defendant's] employment with General Mills terminated?

A. July 17, 2004.

Q. Does it indicate why?

[Defendant's attorney]: Your Honor, may we approach. [sic]

(At this time counsel approached the bench, and the following proceedings were had:)

[DEFENDANT'S ATTORNEY]: Judge, I would object to the (indiscerni-

---

8. The agreement with defendant provided that he would "make up the difference" later

with respect to the child support he owed.

ble) (indiscernible.) (Indiscernible) shown to us (indiscernible.)[9]

[ASSISTANT PROSECUTING AT-TORNEY]: Well, they're—they're their responsibilities in their employment is to find out why people aren't working, and if—if a child support worker contacted General Mills, I think it ought to come out.

THE COURT: I'm going to allow it. I'm going to allow it to come in.

(Proceedings returned to open court.)

BY [ASSISTANT PROSECUTING AT-TORNEY]:

. . .

Q. When you get notice that a non-custodial parent is no longer working, is your—how do I say this? Is—Is it your—Is it your requirement to find out why they're no longer working?

A. It's not required. Sometimes we contact the employer to see if they have new employment information. Like, if they give a reason, like they're leaving this job to go to work someplace else.

Q. Was the reason for [defendant] quitting—being terminated from General Mills, inquired into by your agency?

[DEFENDANT'S ATTORNEY]: Your Honor, I will object to the form of the question unless he can lay some type of foundation that he quit, he should not be asking—

THE COURT: He changed that. He—I think he changed his question to termination rather than quit. So strike the quitting.

[DEFENDANT'S ATTORNEY]: Okay.

THE WITNESS: It was to our—to our understanding that he voluntarily left employment.

[DEFENDANT'S ATTORNEY]: Your Honor, may we approach. [sic]

(At this time counsel approached the bench, and the following proceedings were had:)

[DEFENDANT'S ATTORNEY]: I'm going to move to strike that last answer for a couple of reasons. Number one, he has testified that it is not in their order and course of business to inquire about specific reasons for leaving employment, unless it's to find out if they've moved on to another. And, number two, he stated some sort of understanding, or inference, without telling us what's in the record.

[ASSISTANT PROSECUTING AT-TORNEY [10]]: I don't disagree with her last objection. I think her first objection was that it wasn't required in the normal course of business, but I think his answer was, I—it was our understanding and I—I think I need to lay a better foundation as to why—

THE COURT: Okay.

[ASSISTANT PROSECUTING AT-TORNEY]:—it was their understanding.

THE COURT: Okay. I—Let's go back and do that and then we'll—we might be back up here again.

The assistant prosecuting attorney resumed questioning Mr. Reed regarding how his agency arrived at the understanding he stated. Mr. Reed said they received a response to a form he identified

---

9. As disclosed in n. 7, *supra*, the record in this case was made by electronic recording device. Portions of testimony that the transcriber did not understand are disclosed as "(indiscernible)."

10. The transcript identifies the speaker as defendant's attorney; however, a reading of the transcript indicates the speaker was the assistant prosecuting attorney.

as "Form 228, dated August 20, 2004." He explained, "It says—It says EE, we termed employment, which to us is employment—employee terminated his employment."

Two objections are noted in the transcript. The first was directed to the question that included four separate "indiscernible" notes by the transcriber in a two-line statement by defendant's attorney. The second was an objection to the form of a question that the trial judge suggested was misunderstood by defendant's lawyer, to which defendant's lawyer answered, "Okay." Thereafter, defendant's attorney moved to strike the witness' statement that his agency had understood defendant voluntarily quit his employment with General Mills. The assistant prosecuting attorney agreed with defendant's attorney's complaint that the basis for the assessment was not stated; that a better foundation was needed.

The trial judge did not rule on the motion to strike but directed that they "go back and do that," suggesting that if the issue remained after further inquiry the attorneys "might be back up here again." No further objection was posed to Mr. Reed's testimony regarding defendant leaving his employment with General Mills.

■ "In order to preserve an evidentiary issue in a jury trial for appellate review, an objection must be made when the evidence is sought to be introduced; that objection must be asserted as error in a motion for new trial; and the issue must be presented in the appeal brief." *State v. Guidorzi*, 895 S.W.2d 225, 228 (Mo.App. 1995). Defendant did not preserve the hearsay objection for this court's review in that it was not objected to at trial. Point I is denied.

■ Point II is directed to testimony of social worker David Reed regarding the circumstances of defendant leaving his employment with KTL Trucking. During the state's case in chief, the assistant prosecuting attorney asked Mr. Reed the following questions and he gave the following answers.

Q. So we have him at KTL. How long did he work for KTL?

A. He worked for KTL from December of '04—His hire date was December 18, '04. His termination date was March 28, '05.

Q. Why was he terminated?

A. Family reasons.

[DEFENDANT'S ATTORNEY]: Your Honor, he has—

BY [ASSISTANT PROSECUTING ATTORNEY]:

Q. Family reasons?

A. That was the information I received from them, yes.

Q. Nothing more specific than that?

A. Just voluntarily quit, family reasons.

[DEFENDANT'S ATTORNEY]: Your Honor, can we approach. [sic]

(At this time counsel approached the bench, and the following proceedings were had:)

[DEFENDANT'S ATTORNEY]: Again, I object to the hearsay of what the employer may or may not have said. (Indiscernible) business records (indiscernible) (indiscernible) necessarily accurately state what the (indiscernible) information supposedly said. [ [11]]

[ASSISTANT PROSECUTING ATTORNEY]: The detail would be no different from General Mills. He was allowed to testify about General Mills, so I would assume—

11. *See* n. 9, *supra*.

THE COURT: Yeah.

[ASSISTANT PROSECUTING ATTORNEY]:—he would be allowed to testify about KTL.

THE COURT: Same ruling. It will be overruled.

(Proceedings returned to open court.)

BY [ASSISTANT PROSECUTING ATTORNEY]:

Q. Did some event occur shortly before he terminated with KTL through the Parent's Fair Share office?

A. They were—After three months, after he had received his CDL, we—the Parent's Fair Share was in the program of increasing—or in the process of increasing his temporary payment plan from $51 to $101 a month. And the income withholding order was issued to KTL for the $101 a month.

Q. When was that?

A. Okay. March 7th was the mailing date for the income withholding order to KTL Trucking.

Q. And how much after that did he terminate his employment with KTL?

A. We received—We received the one payment from KTL, so it was at the end of his—the week that that went to— into place.

Q. So the $23.31 is one week's employment with KTL (indiscernible).

A. Right. If you take that and multiply it times 52 and divide it by 12, that is what the weekly payment works out to be for $101 a month.

The assistant prosecuting attorney clarified that the Parent's Fair Share directive regarding a minimum monthly payment did not supersede the court's award of child support. Defendant's attorney then proceeded with cross-examination.

Defendant's attorney inquired about the notice that had been received regarding the end of defendant's employment at KTL. Mr. Reed answered that he did not receive a notice, but had been asked to contact KTL to get information; that he "spoke to their payroll department" the previous day. He added that "on-line verification" had also been received. Defendant's attorney requested to approach the bench. The transcript reflects the following.

(At this time counsel approached the bench, and the following proceedings were had:)

[DEFENDANT'S ATTORNEY]: This was not provided to us in discovery. (Indiscernible) (indiscernible) indication that Mr. Reed had such a form. I'm goint to attempt to change (indiscernible) (indiscernible), and I'm going to ask for am [sic] mistrial. And I'm going to ask that this information be stricken as hearsay. (Indiscernible) telephone call made after the (indiscernible) (indiscernible.) That's not at or near the time of the incident that (indiscernible) business records would require.[12]

The trial judge stated that he would strike the testimony regarding the reason for the termination at KTL. The proceedings returned to open court. The trial judge then instructed, "The jury will disregard the reference to why the defendant left the employment of KTL, and your other motion that you made will be overruled."

The parties filed a written stipulation in this court on June 8, 2007, regarding the content of trial objections that were described in the transcript as "indiscernible." The stipulation states, "The parties agree that the objections as stated at trial are accurately reflected in paragraphs 5, 6,

12. See n. 9, supra.

and 8 of [defendant's] Motion for Judgment of Acquittal or in the Alternative for New Trial, which is contained in the Legal File for this appeal at pages 28–29 thereof." Paragraph 6 of defendant's motion states:

> The trial court erred in overruling Defendant's motion for mistrial when the State introduced hearsay evidence that defendant had voluntarily quit his job at KTL Trucking. This was error for all the reasons and grounds set out at trial. It denied Defendant his right to effective confrontation and cross-examination of the witnesses against Defendant, presentation of witnesses and evidence in the Defendant's own behalf, due process of law, a fair trial, and effective assistance of counsel, . . . as well as his right to be tried solely on legally relevant evidence and evidence which has not been excluded by the Court, and his right to be tried on evidence whose probative value does not outweigh its undue prejudice and tendency to inflame the jury. In addition, the evidence was adduced in violation of discovery rules, in that the State had not produced the documentation on which this testimony was based prior to trial. In preparing a strategy for trial, Defendant's counsel relied upon information provided by the State. That strategy was negatively impacted by the late disclosure in the testimony of the family support division representative. . . .

▆▆▆ Point II contends "[t]he trial court erred . . . in failing to grant a mistrial when enforcement technician David Reed testified [defendant] had voluntarily left his employment at KTL Trucking . . . in that the testimony was hearsay since it was based on information acquired from a nontestifying witness or source offered to prove the truth of the matter asserted and in that it was not admissible under any exception to the hearsay rule. The hearsay related to [defendant's] good cause, or lack thereof, for failing to provide child support, depriving [defendant] of a fair trial."

"[O]ur standard of review for a trial court's refusal to grant a mistrial is abuse of discretion." *State v. McGowan*, 184 S.W.3d 607, 610 (Mo.App.2006). This is because the trial court has observed the complained of incident that precipitated the request for a mistrial and is in a better position than is the appellate court to determine what prejudicial effect, if any, the incident had on the jury. *Id.* "We will find that a trial court abused its discretion when its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary as to shock [this Court's] sense of justice and indicate a lack of careful consideration." *Id.* " 'Granting a mistrial is a drastic remedy and should be exercised only in extraordinary circumstances where the prejudice to the defendant cannot be removed any other way.' " *State v. Albanese*, 9 S.W.3d 39, 51 (Mo.App.1999) (quoting *State v. Wyman*, 945 S.W.2d 74, 77 (Mo.App.1997)).

*State v. Wheeler*, 219 S.W.3d 811, 815 (Mo. App.2007).

The trial court instructed the jury to disregard the reference to why defendant left the employment of KTL. "The jury is presumed to have followed the court's instructions." *Rains v. Herrell*, 950 S.W.2d 585, 588 (Mo.App.1997). *See also State v. Fortner*, 84 S.W.3d 507, 512 (Mo.App. 2002). This court does not find that the ruling denying defendant's request for mistrial and instructing the jury to disregard the testimony to which Point II was arbitrary; nor does it find that the ruling was made without the necessary lack of careful consideration. This court finds no

abuse of discretion by the trial court's denial of defendant's request for mistrial. Point II is denied.

Point III is directed to the trial court's denial of defendant's motion for acquittal filed at the close of the state's evidence. Point III argues that the trial court erred in denying the motion; that the state did not prove defendant failed to provide child support "without good cause." Defendant contends he "injected the issue of good cause by introducing: records of numerous mandatory court appearances; evidence that his job terminations were not voluntary; evidence that he had sought employment; and evidence that he lacked assets which could be liquidated to pay the support." He contends the state produced no evidence he had work available to him or other means available by which he could have supported his children; that, therefore, the evidence was not sufficient to support the conviction that is the subject of this appeal.

*State v. Gilbert,* 103 S.W.3d 743 (Mo.banc 2003), explains:

In reviewing the sufficiency of evidence to support a conviction, this Court reviews the evidence, together with all reasonable inferences, in the light most favorable to the State, disregarding all evidence and inferences to the contrary. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc), *cert. denied,* 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). "[R]eview is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *[State v.] Dulany,* 781 S.W.2d [52] at 55 [ (Mo.banc 1989) ].

*Id.* at 749.

Section 568.040.1 provides:

A person commits the crime of nonsupport if he knowingly fails to provide, without good cause, adequate support for his spouse; a parent commits the crime of nonsupport if such parent knowingly fails to provide, without good cause, adequate support which such parent is legally obligated to provide for his child or stepchild who is not otherwise emancipated by operation of law.

Section 568.040.2 states:

For purposes of this section:

. . .

(2) **"Good cause"** means any substantial reason why the defendant is unable to provide adequate support. Good cause does not exist if the defendant purposely maintains his inability to support;

A defendant, however, has the burden of injecting the issue of "good cause" in the trial of a criminal charge of nonsupport. § 568.040.3.

When the phrase **"The defendant shall have the burden of injecting the issue"** is used ..., it means

(1) The issue referred to is not submitted to the trier of fact unless supported by evidence; and

(2) If the issue is submitted to the trier of fact any reasonable doubt on the issue requires a finding for the defendant on that issue.

§ 556.051. When the state has the burden of proving a negative fact, e.g., that defendant did not have good cause for not providing support, it may be proven by circumstantial evidence. *State v. Arnett,* 370 S.W.2d 169, 173 (Mo.App.1963).

There was evidence that defendant was able-bodied; that he stacked firewood; he mowed his parents' yard. Defendant obtained a commercial driver's license, a CDL, through a retraining program co-sponsored by Child Support Enforcement and Parent's Fair Share. Evidence dem-

onstrated that defendant was capable of obtaining employment; he had secured jobs with General Mills and KTL Trucking. He had military training and one year of college. There was testimony that defendant had made the statement as he left a court hearing that he was not going to pay child support and that he characterized "child support" with an expletive.

A jury is permitted to draw such reasonable inferences from evidence presented as that evidence will permit. *State v. Hineman,* 14 S.W.3d 924, 927 (Mo.banc 1999). A jury may believe or disbelieve all, part, or none of the testimony of any witness. *Id.* See also, *State v. Gaskins,* 66 S.W.3d 110, 115 (Mo.App. 2001). There was sufficient evidence from which a reasonable juror could find defendant guilty beyond a reasonable doubt of failing to provide child support without having good cause. Point III is denied. The judgment of conviction is affirmed.

BATES, J. concurs; SCOTT, J., concurs in result.