**STATE of Missouri, Respondent,**

v.

**Justin T. MOYERS, Appellant.**

**No. WD 68026.**

Missouri Court of Appeals, Western District.

Sept. 2, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 28, 2008.

Craig Allan Johnston, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Linda Lemke, Jefferson City, MO, for respondent.

Before JOSEPH M. ELLIS, P.J., RONALD R. HOLLIGER and JOSEPH P. DANDURAND, JJ.

JOSEPH P. DANDURAND, Judge.

Justin Moyers appeals his conviction for murder in the second degree. He presents three points on appeal: (1) the trial court erred in permitting evidence of his arrest while free on bond; (2) the trial court abused its discretion in admitting a videotape of a chase with law enforcement; and (3) admitting testimony from a forensic pathologist that the victim died from intentional suffocation was plain error. The points are denied, and the judgment of conviction is affirmed.

## Facts

This court considers the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, disregarding all contrary evidence and inferences. *See State v. Woodmansee*, 203 S.W.3d 287, 289 (Mo.App. S.D.2006). Viewed from that perspective, the favorable evidence and inferences supporting the State's case against Mr. Moyers are summarized below.

In October 1999, Jaimmilynn Millsap and her two children, Miranda (one year old) and Wraith (five years old), lived with Ms. Millsap's boyfriend, Justin Moyers, in a mobile home in Caldwell County. On October 4, 1999, Ms. Millsap's mother watched the children at her residence while Ms. Millsap and Mr. Moyers were working. Miranda fell and hit her head on a chair while at her grandmother's house; she had a bump on her head as a result. Mr. Moyers arrived around 8:00 PM to pick up the children and take them home. He was angry with Ms. Millsap when he arrived; he told Ms. Millsap's mother that Ms. Millsap was having an affair, and he called Ms. Millsap names. Mr. Moyers took the children home; Ms. Millsap was working a night shift and was not present.

Mr. Moyers's mobile home was located next to his parent's mobile home. During the evening of October 4, 1999, Mr. Moyers called his parents and told them that Miranda was not breathing and he needed help. When Mr. Moyers's father arrived at Mr. Moyers's residence, he saw Miranda lying on a blanket with Mr. Moyers nearby. Miranda was blue; she had blood around her lips and bubbles around her nose. Mr. Moyers's father began CPR in accordance with instruction provided by a 911 operator. Two law enforcement officers arrived at Mr. Moyers's house at approximately 10:09 PM. They attempted to perform CPR while waiting for an ambulance to arrive. An ambulance arrived, and Miranda was taken to a hospital at approximately 10:23 PM. When she arrived, she had no signs of life. She was pronounced dead at 11:43 PM.

Mr. Moyers told law enforcement officers that a loud vehicle woke him up, and Miranda was completely covered by a

blanket when he checked on her. When he uncovered her, she was not breathing. A police detective observed a bruise and bump on Miranda's face. Upon viewing Miranda's body, Ms. Millsap's mother observed bruising on Miranda's face that was not present when Mr. Moyers picked her up earlier that evening.

On October 5, 1999, the day after Miranda died, Ms. Millsap's mother observed that Wraith's buttocks were black and blue. The marks had not been present when she watched him the prior day. She contacted the sheriff's department. A deputy observed and photographed small red bruises all over Wraith's buttocks. Mr. Moyers admitted spanking Wraith and subsequently pled guilty to misdemeanor assault of Wraith for the spanking.

In his written statement to police, Mr. Moyers again stated that he was awakened by a loud noise, went to check on Miranda, and discovered her wrapped in a blanket. He stated she was almost completely covered by the blanket, that only her foot and a portion of her leg were visible. She was laying face-down. When he uncovered her, she was not breathing. He called his parents and asked them to call 911. His father came over and began CPR; there was a red, foamy material coming out of her mouth.

Shortly after Miranda's death, Ms. Millsap's sister was at the county jail to make a statement. While there, she overheard Mr. Moyers say: "Oh, shit, I killed a nigger." She reported this to a guard, though it was not documented at the time.

On October 5, 1999, forensic pathologist Dr. Samuel Gulino performed an autopsy on Miranda. There were no head injuries, and he was able to exclude disease as the cause of death. He was unable to come to any conclusions to a reasonable degree of scientific certainty as to the cause of death. He ruled the cause of death "undeter-

mined." Dr. Gulino was concerned by the presence of bruising and scrapes on Miranda's face. Those injuries appeared to have occurred within less than 24 hours before her death. Dr. Gulino added a comment to his autopsy report dated November 3, 1999, that the facial injuries were "worrisome for non-accidental injury and the case is therefore suspicious for foul play." He also wrote that "an asphyxia death such as suffocation cannot be excluded."

Dr. Gulino subsequently moved to Florida. During the summer of 2001, he was asked by law enforcement officers to examine additional information and re-examine Miranda's case. On September 18, 2001, Dr. Gulino wrote the Jackson County, Missouri, Medical Examiner's Officer a letter stating that, based upon additional investigative information provided to him by law enforcement, he was reclassifying the case as a homicidal asphyxia. He requested the following changes to the front sheet of the autopsy report: manner of death from undetermined to homicide; immediate cause of death from undetermined to asphyxia; and how injury occurred from reportedly found unresponsive not breathing to assaulted by others. An amended autopsy report was issued October 3, 2001. The only change was a new face sheet replacing the old face sheet. The cause of death was listed as asphyxia, and the manner of death was listed as homicide.

There were no changes from a medical standpoint between the time of the original report and the amended report. The new information Dr. Gulino received included a written statement made by Mr. Moyers wherein he described an action he did while attempting to stop Miranda's crying. Mr. Moyers stated he pushed Miranda down in a corner where she was lying, and she stopped crying. It was Dr. Gulino's opinion that Miranda was intentionally suf-

focated. The fact that there were facial bruises would not be consistent with an accidental death due to a blanket being wrapped around Miranda. Further, that blood was coming from Miranda's nose and mouth was worrisome. He believed that Miranda did not die of natural causes; instead, she died of asphyxia from a homicide.

On March 6, 2002, a complaint was filed in Caldwell County charging Mr. Moyers with second degree murder for causing Miranda's death by suffocating her. He was released on bond. His bond was subsequently revoked and, on March 15, 2003, Mr. Moyers was in custody in the Ray County Jail as a result. He escaped from the jail by pulling a light down from the ceiling and crawling through the ceiling.

On March 17, 2003, Mr. Moyers arrived at Lawrence Brophy's mobile home in rural Cameron, Missouri. Mr. Moyers stated that he needed a place to stay. Mr. Brophy allowed him to spend the night, despite knowing that Mr. Moyers was wanted by law enforcement. Mr. Moyers told Mr. Brophy that he escaped jail and that he was wanted for murder. Mr. Brophy urged Mr. Moyers to turn himself in, but Mr. Moyers refused. Mr. Moyers told Mr. Brophy that he had "murdered this baby" by flipping her over and pushing her face down in blankets or pillows. He stated he was trying to stop Miranda's crying and "this is the way we put kids to sleep in Missouri." Mr. Brophy stated that Mr. Moyers laughed about the situation.

Mr. Brophy called law enforcement the next morning. When they arrived, Mr. Moyers stole a truck and fled. A police chase ensued. During the course of the chase, Mr. Moyers attempted to strike law enforcement vehicles, rammed law enforcement vehicles, attempted to force law enforcement vehicles off the road, and attempted to push one officer down an embankment. Mr. Moyers ran over spike strips but continued to drive with deflated tires. He twice attempted to strike the officer who placed the spike strips on the road. The seventy mile chase lasted approximately one hour. Mr. Moyers's vehicle was stopped by police in Kansas City when he attempted to cross a median and became stuck in the grass. During the chase, Mr. Moyers's average speed was between ninety and ninety-five miles per hour. No officer was hurt during the chase. Corporal Paul Kimbell of the Missouri Highway Patrol recorded with the camera located in his vehicle his initial attempt to stop Mr. Moyers and the ensuing police chase. Mr. Moyers subsequently pled guilty to the escape, to assaulting a law enforcement officer, and to tampering with a vehicle.

A jury trial was held November 27–29, 2006. At trial, Mr. Moyers testified that Miranda was crying and would not take her bottle, so he pushed down on her a little into the corner and she made an "ah ah" sound and quieted down a little bit. He stated that she took the bottle and was fine. The jury found Mr. Moyers guilty of murder in the second degree. On January 26, 2007, the trial court overruled Mr. Moyers's motion for a new trial and sentenced him to life imprisonment. This timely appeal followed. Further facts will be set forth as necessary.

### Standard of Review

Appellate courts view the evidence presented at trial in the light most favorable to the verdict. *State v. Johns,* 34 S.W.3d 93, 103–04 (Mo. banc 2000). "The trial court is vested with broad discretion to admit and exclude evidence at trial." *Id.* "Error will be found only if this discretion was clearly abused." *Id.*

A trial court's refusal to grant a mistrial is reviewed for an abuse of discretion.

*State v. McGowan,* 184 S.W.3d 607, 610 (Mo.App. E.D.2006). A trial court has "abused its discretion when its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary and unreasonable as to shock our sense of justice and indicate a lack of careful consideration." *Id.*

On direct appeal, appellate courts review the trial court "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Johns,* 34 S.W.3d at 103 (quote marks and citation omitted). "Issues that were not preserved may be reviewed for plain error only, which requires the court to find that manifest injustice or miscarriage of justice has resulted from the trial court error." *Id.* at 103–04.

## Point I

In his first point on appeal, Mr. Moyers claims the trial court erred in overruling his motion for a mistrial and in overruling his objections to the State's questioning pertaining to revocation of his bond. He claims the prejudicial nature of the evidence outweighed its probative value and that the line of questioning was improper. The point is denied.

After the State rested its case, Mr. Moyers testified as part of his defense. During direct examination, Mr. Moyers testified that after he was arrested, he waived preliminary hearing on the condition that his bond would be lowered and he would be released on house arrest. While on house arrest, he moved from his parent's residence to a girlfriend's residence. His girlfriend had a four-year old daughter. The daughter's babysitter had a young infant, and the infant would accompany the babysitter to the girlfriend's house almost every day. Mr. Moyers testified that his house arrest was terminated because he was in the presence of a young child.

Prior to the State's cross-examination of Mr. Moyers and outside the presence of the jury, the State asked the court to take judicial notice of two documents. The first was a Memorandum to Clerk about termination of Mr. Moyers's house arrest because he was around young children. It was filed December 30, 2002. It revoked Mr. Moyers's posted bond and reinstated the original, higher bond. Mr. Moyers had no objection. The second was a Motion for Bond Revocation that was filed December 11, 2002. It moved to revoke the bond because Mr. Moyers was charged on December 7, 2002, with committing the crimes of burglary in the second degree and felony stealing. Mr. Moyers's counsel objected to the motion to revoke bond, stating it referenced "still pending matters" and was improper. The court stated it would take judicial notice of the documents but had not decided whether the jury would see the evidence.

The prosecutor stated to the judge that he believed the evidence was relevant and admissible because Mr. Moyers testified that his bond was revoked because he was around a young child, when instead it was revoked because "he was on a crime spree" while out on bond. The court stated it would allow questioning on that particular subject matter for the reasons given. On cross examination, the following occurred:

[Prosecutor]: OKAY. LET ME SHOW YOU THIS, SIR, ISN'T IT TRUE THAT THE REASON YOUR BOND WAS REVOKED WAS BECAUSE YOU WENT ON A CRIME SPREE?

[Mr. Moyers's Counsel]: OBJECTION, JUDGE—

[Mr. Moyers]: NOT THAT I'M AWARE OF, SIR.

. . . .

[Prosecutor]: WHEN YOU AND MR. ALBERT KINSEY WERE ARRESTED FOR BURGLARY AND STEALING WHILE YOU OUT ON BOND, YOU WERE, WEREN'T YOU?

[Mr. Moyers]: YES, SIR.

[Prosecutor]: AND YOUR BOND WAS REVOKED BECAUSE YOU'D BEEN ARRESTED FOR BURGLARY AND STEALING?

[Mr. Moyers]: NOT THAT I'M AWARE OF, SIR.

[Prosecutor]: YOU'RE NOT AWARE OF THAT?

[Mr. Moyers]: NO.

[Prosecutor]: YOU DON'T REMEMBER APPEARING BEFORE JUDGE STEVEN GRIFFIN ON DECEMBER 30TH OF

2002?

[Mr. Moyers]: YES, SIR.

[Prosecutor]: AND WHERE HE REVOKED YOUR BOND BECAUSE THE PROSECUTOR AT THAT TIME, KIM BROWN, HAD FILED A MOTION TO REVOKE YOUR BOND?

[Mr. Moyers]: MY UNDERSTANDING THE REASON MY BOND WAS REVOKED WAS BECAUSE I WAS AROUND THE INFANT CHILD AND IT HAD NOTHING TO DO WITH NOTHING ABOUT NO OTHER CRIME.

. . . .

[Prosecutor]: . . . DO YOU REMEMBER JUDGE

GRIFFIN ISSUING THAT ORDER REVOKING YOUR

BOND ON DECEMBER 30TH, 2002?

. . . .

[Mr. Moyers]: IF YOU NOTICE RIGHT HERE (INDICATES) IT SAYS "AND CONFIRMATION OF SAME BY LETTER FROM MS. LISA CAR-

NEY." THAT'S THE INFANT'S GRANDMA. THAT'S WHAT I WAS TOLD SO THAT'S WHAT I WAS AWARE OF MY BOND BEING REVOKED.

[Prosecutor]: AND IT ALSO SAYS THAT THE NORTHWEST CORRECTIONAL SERVICES HAS ALSO TERMINATED DEFENDANT FROM THE HOUSE ARREST PROGRAM, IS THAT RIGHT?

[Mr. Moyers]: LET ME SEE IT TO MAKE SURE YOU SAID IT RIGHT. (EXAMINES DOCUMENT.) YES, SIR, DUE TO, FROM MY UNDERSTANDING IS FOR BEING AROUND INFANTS STILL. I'VE NEVER BEEN AWARE OF ANY OF THIS OTHER STUFF, SIR.

[Prosecutor]: WELL, LET ME GO BACK TO EXHIBIT 41; DO YOU SEE WHERE THE PROSECUTOR HAS MOVED TO REVOKE YOUR BOND BECAUSE YOU HAD BEEN CHARGED WITH COMMITTING THE CRIMES OF BURGLARY IN THE SECOND DEGREE AND FELONY STEALING IN THE ASSOCIATE CIRCUIT COURT OF CALDWELL COUNTY?

[Mr. Moyers]: YES, I SEE WHERE IT SAYS THAT.

[Prosecutor]: OKAY, AND YOUR WERE, IN FACT, ARRESTED FOR THOSE CHARGES, WEREN'T YOU?

[Mr. Moyers]: I WAS ARRESTED ON DECEMBER 7TH OF 2002. AND THAT EVENING I WENT IN FRONT OF JUDGE CHADWICK IN ASSOCIATE DIVISION. AND JUDGE CHADWICK RELEASED ME ON BOND. SO, I WAS ON BOND FROM DECEMBER 7TH OF 2002 UNTIL DECEMBER 30TH OF 2002, WHICH IS WHAT I BELIEVED MY BOND WAS REVOKED FROM BEING

AROUND INFANTS. I DIDN'T KNOW NOTHING ABOUT THIS PAPER HERE, THIS IS THE FIRST TIME I'VE EVER SEEN IT.

[Prosecutor]: LET'S JUST BE CLEAR; WHILE YOU WERE OUT ON BOND YOU WERE ARRESTED AND CHARGED FOR BURGLARY IN THE SECOND DEGREE AND STEALING, YOU AND MR. KINSEY, CORRECT?

[Mr. Moyers]: I WAS CHARGED. AS OF THIS DATE I'VE BEEN, IN FACT, BEEN FOUND GUILTY OR PLED GUILTY TO THOSE CASE.[1]

[Prosecutor]: BUT THOSE CHARGES WERE PENDING?

[Mr. Moyers]: NOT THAT I'M AWARE OF.

[Prosecutor]: OKAY. AND YOU DON'T THINK THAT THE FACT THAT YOU, WHILE OUT ON BOND AND GOT ARRESTED FOR ADDITIONAL CHARGES HAD ANYTHING TO DO WITH YOUR BOND BEING REVOKED IN THIS CASE?

Mr. Moyers argues that the trial court erred in denying his request for a mistrial concerning the phrase "crime spree" used by the prosecutor and the line of questioning pertaining to the burglary and stealing charges.

 While the trial court has discretion in determining whether evidence of other illegal conduct is admissible, its highly prejudicial nature requires the court to be "rather strict and circumspect." *State v. Henderson*, 105 S.W.3d 491, 495 (Mo. App. W.D.2003). The court should rule such evidence admissible only when it is clearly so. *Id.* "This is because such evidence may cause a jury to convict a defen-

dant on the basis of perceived propensities rather than on the basis of substantial and competent evidence." *Id.* "Only when evidence of uncharged misconduct clearly is logically and legally relevant to establishing the defendant's guilt of the crime for which he is on trial is it admissible." *Id.*

 "A defendant who testifies can be cross-examined and impeached like any other witness." *State v. Collier*, 892 S.W.2d 686, 690 (Mo.App. W.D.1994). "Evidence of prior arrests is generally not admissible to impeach the credibility of a defendant." *State v. Thomas*, 878 S.W.2d 76, 77 (Mo.App. E.D.1994). "However, such evidence is admissible if the defendant has 'opened up' the issue of prior arrests." *Id.* "Once defendants bring their own good character into issue, they may be impeached with their prior arrests to test their good character and credibility as witnesses." *Id.* "When a collateral issue is first tendered by the defense in direct examination or is volunteered on cross-examination, it becomes a proper subject for rebuttal." *State v. Primers*, 971 S.W.2d 922, 930 (Mo.App. W.D.1998). If this were not permitted, "a defendant would be free to testify to any matter concerning his good character and then simply deny on cross-examination any questions about matters reflecting on his character." *Id.*

The State contends that Mr. Moyers "opened the door" to the issue of why his bond was revoked when he testified about it during direct examination. Mr. Moyers testified that his bond was revoked for being around an infant and that while free on bond he never tried to run or leave the country. He also testified that he pled

---

1. Mr. Moyers appears to testify that the charges for burglary and stealing resulted in a conviction. On appeal, Mr. Moyers argues and all parties agree that the charges did not result in a conviction. That is his basis for arguing it was improper to question him about them. This appears to be a misstatement by Mr. Moyers.

guilty to escaping jail and the events that followed because he was guilty and that he pled not guilty to Miranda's murder because he was not guilty. He said he was sorry for escaping and the events surrounding the police chase. The State contends that Mr. Moyers's testimony left the jury with the impression that he had been a law abiding citizen while out on bond, that his bond was revoked for something relatively innocuous, and that his later escape was an aberration he regretted and for which he took responsibility.

■ The State's argument is not compelling, and it was error to question Mr. Moyers about a "crime spree" and his prior arrests. The reason for Mr. Moyers's bond revocation was not relevant to the crime for which he was charged: the murder of Miranda. Mr. Moyers's counsel questioned Mr. Moyers about his bond revocation and subsequent arrest and escape in direct examination. He also elicited testimony that Mr. Moyers did not try to run or leave the country while out on bond. This was done to explain and mitigate the evidence of escape already introduced by the State.

Mr. Moyers did not testify he had not been arrested or in trouble either before or after his arrest for Miranda's murder. He did not claim this was the only time he had been involved in illegal activity. To the contrary, Mr. Moyers testified he had previously been incarcerated for a prior crime. Thus, the State's questioning did not impeach an assertion of Mr. Moyers's good character. *Compare Thomas*, 878 S.W.2d at 77 (holding it was not error to question defendant about arrests in prior eight or nine years when defendant testified he had not been in trouble during that time period); *State v. Campbell*, 868 S.W.2d 537, 539–40 (Mo.App. E.D.1993)(holding it was not error to question defendant about prior arrest where

defendant testified he had never been in trouble before); *State v. Garrett*, 813 S.W.2d 879 (Mo.App. E.D.1991)(holding it was not error to question defendant about prior arrests where defendant testified he had not been in trouble since an old conviction).

Further, Mr. Moyers did not attempt to portray himself as a law-abiding citizen who made a few mistakes and had his bond revoked for an innocuous reason. Having one's bond revoked for being in the presence of an infant hardly seems innocuous in light of the fact that Mr. Moyers was on trial for murdering an infant and that he had previously pled guilty to assaulting a different child. Mr. Moyers never testified he was law-abiding while out on bond. To the contrary, he admitted he violated the terms of his house arrest and that his house arrest was terminated as a result.

Mr. Moyers testified his bond was revoked because he was in the presence of an infant. The State contends this was a lie and its questioning directly rebutted the false statement. The facts are complicated in that the documentation supports both reasons for bond revocation. The memo to the clerk from the circuit judge revoking Mr. Moyers's bond makes no reference to Mr. Moyers being arrested for burglary and stealing; conversely, the motion to revoke bond filed by the prosecuting attorney makes no reference to Mr. Moyers's being in the presence of children. Assuming the State is correct, and Mr. Moyers lied or only told half the truth of why his bond was revoked, its questioning was still impermissible impeachment. In *State v. Todd*, 468 S.W.2d 632, 633 (Mo.1971), a defendant charged with burglary was asked on direct examination whether he had been arrested before. He stated he had been arrested on "Tickets or suspicion of burglary is all." *Id.* On cross examination, the State ques-

tioned the defendant extensively about numerous prior arrests. *Id.* at 633–34. On appeal, the State claimed its questioning was not for impeachment; instead, it was to clarify the defendant's voluntary statement that he had been arrested on suspicion of burglary. *Id.* at 634. The Missouri Supreme Court rejected the State's argument, stating the only basis for the testimony was for purposes of impeachment. *Id.* The court further determined it was improper impeachment, stating that a voluntary reference to prior arrests does not justify the violation of the rule that prior arrests without conviction are inadmissible. *Id.* at 635. Similarly, Mr. Moyers's reference to the reason for his bond revocation did not justify the State's questioning.

Mr. Moyers testified that his bond was revoked. That it was revoked explained his subsequent arrest and how he came to be in the jail from which he escaped. The reason for the revocation was irrelevant to his escape or Miranda's death. The State's questioning about his arrests while out on bond did not directly rebut any of his testimony and did not rebut an assertion of general good character or good behavior.

There is still the issue of prejudice. Appellate courts reverse "only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Kemp*, 212 S.W.3d 135, 145 (Mo. banc 2007). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *Id.* at 145–46 (quote marks and citation omitted). "A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence." *State v. Blakey*, 203 S.W.3d 806, 814 (Mo.App. S.D. 2006)(quote marks and citation omitted). "[O]verwhelming evidence of guilt may lead an appellate court to find that a defendant was not prejudiced by trial court error." *State v. Banks*, 215 S.W.3d 118, 121 (Mo. banc 2007); *see also State v. Samuels*, 965 S.W.2d 913, 920 (Mo.App. W.D.1998)("Cases are legion standing for the proposition that evidence which might be considered prejudicial in a close case can be considered harmless if evidence of guilt is strong.").

Mr. Moyers asserts he was prejudiced. He notes the following evidence presented at trial. Dr. Gulino was initially unable to determine the cause of Miranda's death. This changed after Dr. Gulino read Mr. Moyers's statement; it did not change because of new medical information. Miranda's nasal septum, oral mucosa, and lips were not damaged. A medical expert testifying on behalf of Mr. Moyers was unable to identify Miranda's cause of death to a reasonable degree of scientific certainty. Mr. Moyers testified he did not murder Miranda. Mr. Moyers concludes this was a close case.

This court disagrees. The extensive evidence presented at trial demonstrates that Mr. Moyers was not prejudiced by the erroneous admission of evidence of his arrest while free on bond. Miranda died from being suffocated. Dr. Gulino testified to this to a reasonable degree of scientific certainty. When Mr. Moyers picked up the children from their grandmother's house, they were both healthy. Mr. Moyers was angry when he picked up the children. Less than two hours later, Wraith had dark bruises from being spanked, and Miranda had facial bruising and was dead. Mr. Moyers told Mr. Brophy that he killed a baby. Ms. Millsap's

sister overheard Mr. Moyers state he killed "a nigger." Mr. Moyers subsequently escaped from jail; he assaulted police officers and led them on a car chase.

Mr. Moyers further relies in part on *State v. Massa*, 512 S.W.2d 912 (Mo.App. 1974). In *Massa*, the defendant was charged with possession of a prohibited substance. *Id.* at 913. He testified to possessing the prohibited substance, but claimed he was unaware of the character of the drug and that he was not consciously and intentionally in possession of it. *Id.* The defendant testified he had previously been convicted for illegal possession of sleeping pills, and that this conviction constituted his only involvement with narcotics. *Id.* On cross-examination, the prosecutor asked the defendant about a prior arrest, without conviction, for possession of marijuana. Defense counsel objected and the jury was instructed to disregard the question. *Id.* The defendant's request for a mistrial was overruled. *Id.* at 914. The court stated: "[I]t is reversible error for a party or witness to be impeached by a showing of an arrest even where he had testified about previous convictions." *Id.* It went on to state: "We have interpreted the rule ... to be that questioning on arrests alone is cause for reversal and remand for a new trial." *Id.*

*Massa* does not stand for the proposition that reversal is required when a defendant is questioned about arrests not leading to conviction; instead, it holds that a court may reverse if there is prejudice. The prior arrest in *Massa* directly related to and undercut the defendant's defense. In the case *sub judice*, the prior arrest was completely irrelevant to the crime charged or Mr. Moyers's defense. Given the evidence at trial, the nature of the prior arrest in relation to the crime charged, and amount of time focused upon

the arrest in the overall course of the trial, Mr. Moyers was not prejudiced.

The point is denied.

## Point II

In his second point on appeal, Mr. Moyers claims the trial court erred in admitting over his objections a videotape of his high speed chase with police. He claims the tape was legally irrelevant because its prejudicial effect outweighed its probative value and it was calculated to unduly arouse the sympathies and emotions of the jury. He asserts that the State had already presented lengthy testimony about his escape from jail and subsequent flight from police. He concludes that, given the marginally probative value of the videotape and its prejudicial effect, the trial court should have limited the amount of evidence presented on the escape and police chase.

During trial, the State presented evidence of a high speed car chase that occurred after Mr. Moyers escaped from jail. Corporal Paul Kimbell of the Missouri Highway Patrol testified that when he went to Mr. Brophy's residence, Mr. Moyers drove at him and attempted to hit him with a truck. During the chase that ensued, Mr. Moyers attempted to force him into a utility pole and later rammed his police vehicle. He also pushed the police car into a ditch. Several times during the chase, Mr. Moyers made efforts to elude police by driving at patrol cars and attempting to push them off the road. Mr. Moyers attempted to hit an officer who placed spike strips in his path. The chase lasted an hour.

The State also showed an edited version of the videotape of the chase recorded with a camera on Corporal Kimbell's patrol car dashboard. The full video was over an hour long; the jury was shown a 20 minute edited version. Mr. Moyers maintains this

was error. He claims the tape was presented in an inflammatory manner, that it contained evidence of other crimes including assault on law enforcement, and that the amount of evidence pertaining to his escape and subsequent flight was excessive.

■■■■ "The general rule regarding flight evidence is that it is relevant and admissible as indicating consciousness of guilt." *State v. Cotton*, 621 S.W.2d 296, 300 (Mo.App. E.D.1981). "Such evidence may include an escape from jail which occurs subsequent to the accused's initial arrest." *State v. Weeks*, 982 S.W.2d 825, 833 (Mo.App. S.D.1998). "Flight may occur from the scene of the crime or elsewhere if it is in order to avoid arrest or prosecution." *Cotton*, 621 S.W.2d at 300. "Remoteness of flight in space and time from the scene and time of the alleged crime goes only to the weight of the evidence and not to its admissibility." *Id.* The defendant is entitled to offer an explanation of the flight. *Id.* That the defendant admits the escape does not render further evidence of the fact irrelevant and prejudicial. *State v. Sprous*, 639 S.W.2d 576, 578 (Mo.1982).

■■■■ Mr. Moyers relies upon the line of cases holding that photographs should not be admitted when their sole purpose is to arouse the emotions of the jury and to prejudice the defendant. *See State v. Floyd*, 360 S.W.2d 630, 633 (Mo. 1962). "[P]hotographs may be admitted to corroborate or refute testimony, and to help the jury to better understand testimony." *State v. Hawkins*, 58 S.W.3d 12, 24 (Mo.App. E.D.2001). "A relevant photograph is not inadmissible because other evidence describes what is shown in the photograph or because it may be inflammatory." *Id.* "Nor must the State forego admission of a photograph because the defendant expresses a willingness to stipu-

late to some of the issues involved." *Id.* (quote marks and citations omitted).

The trial court did not abuse its discretion in admitting the edited tape of the car chase. A law enforcement officer testified for four pages about Mr. Moyers's escape from jail. Corporal Kimbell testified for approximately 23 pages about the car chase. This was done just prior to the jury viewing the tape and was intended to explain what the tape, which was recorded by Corporal Kimbell's vehicle, would show. The tape was relevant as it showed Mr. Moyers's flight from police. The amount of evidence presented was not excessive.

The tape's prejudicial effect did not outweigh its probative value. While the actual chase was an hour long, the tape was twenty minutes in length and was comprised of the "highlights." Mr. Moyers was given the opportunity to show the entire tape to the jury. The jury was informed that the tape had been edited to a third of the length of the chase. Further, Mr. Moyers had the opportunity, and actually did, explain his escape from jail and the subsequent chase. Finally, the tape was not gruesome or violent.

The point is denied.

## Point III

■■ In his third point on appeal, Mr. Moyers claims the trial court erred in failing to declare a mistrial when Dr. Gulino testified that he believed Miranda was intentionally suffocated and died as a result of a homicide. He asserts that Dr. Gulino testified on the ultimate issue of whether Mr. Moyers knew or was aware that his conduct was causing or practically certain to cause Miranda's death. He states it invaded the province of the jury. Mr. Moyers requests plain error review as this issue was not preserved at trial.

Mr. Moyers's point pertains to the following testimony:

[Prosecutor]: OKAY. DID YOU ALSO MAKE ANY CONCLUSIONS ABOUT WHETHER OR NOT THIS, THE DEATH OF MIRANDA [ ] WAS INTENTIONAL OR NOT?

[Dr. Gulino]: IT WAS MY IMPRESSION, BASED UPON THE TOTALITY OF THE EVIDENCE, THAT SHE WAS SUFFOCATED INTENTIONALLY.

[Prosecutor]: A HOMICIDE?

[Dr. Gulino]: CORRECT.

[Prosecutor]: OKAY, AND IS THAT AN OPINION THAT YOU HOLD TO A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY?

[Dr. Gulino]: YES.

Mr. Moyers claims this was testimony on an ultimate issue and invaded the province of the jury. He cites *State v. Clements*, 789 S.W.2d 101, 109 (Mo.App. S.D.1990), which held that it was error for an expert to opine on whether the defendant deliberated.

 Plain error review is limited to determining whether there was an error affecting substantial rights that resulted in manifest injustice or a miscarriage of justice. *State v. Presberry*, 128 S.W.3d 80, 85 (Mo.App. E.D.2003). The court first determines whether there is an error that is "evident, obvious, and clear." *State v. Roper*, 136 S.W.3d 891, 900 (Mo.App. W.D. 2004). If so, the court considers whether a manifest injustice or miscarriage of justice has occurred as a result of the error. *Id.* The appellant bears the burden of showing that plain error occurred and that it resulted in a manifest injustice or miscarriage of justice. *Id.* Plain error review depends heavily on the specific facts and circumstances of the case. *Id.*

 "[A]n expert is allowed to testify as to his or her opinion on an ultimate issue in a criminal case as long as the opinion does not state that the defendant is guilty of the crimes." *State v. Fewell*, 198 S.W.3d 691, 697 (Mo.App. S.D.2006). Further, "forensic pathology is a subspecialty of pathology dealing specifically with the work of medical examiners, in particular determining the cause of death (the immediate physical condition that precipitated death) and the manner of death (the circumstances under which the death occurred)." *State v. Knese*, 985 S.W.2d 759, 768 (Mo. banc 1999). Dr. Gulino testified he was a certified forensic pathologist who had performed about 4,000 autopsies. Thus, his determination that Miranda was intentionally suffocated and died as a result of a homicide was precisely within the area of expertise of a forensic pathologist. *Id.* at 768–69. Mr. Moyers has not demonstrated plain error.

The point is denied.

## Conclusion

The trial court erred in permitting evidence of Mr. Moyers's arrest while free on bond. The error was not prejudicial, however. The trial court did not abuse its discretion in admitting the videotape of the chase with law enforcement. Dr. Gulino's testimony that Miranda died from intentional suffocation was not plain error. The judgment of conviction is affirmed.

ELLIS, P.J. and HOLLIGER, J. concur.